# ROPER, SUPERINTENDENT, POTOSI CORREC-TIONAL CENTER *v.* SIMMONS

No. 03-633. Argued October 13, 2004—Decided March 1, 2005

552

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, in which GINSBURG, J., joined, *post*, p. 587. O'CONNOR, J., filed a dissenting opinion, *post*, p. 587. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 607.

*James R. Layton*, State Solicitor of Missouri, argued the cause for petitioner. With him on the briefs were *Jeremiah W. (Jay) Nixon*, Attorney General, and *Stephen D. Hawke* and *Evan J. Buchheim*, Assistant Attorneys General.

*Seth P. Waxman* argued the cause for respondent. With him on the brief were *David W. Ogden* and *Jennifer Herndon*, by appointment of the Court, 541 U. S. 1040.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Alabama et al. by *Troy King*, Attorney General of Alabama, *Kevin C. Newsom*, Solicitor General, and *A. Vernon Barnett IV*, Deputy Solicitor General, and by the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware, *W. A. Drew Edmondson* of Oklahoma, *Greg*

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to address, for the second time in a decade and a half, whether it is permissible under the Eighth and Fourteenth Amendments to the Constitution of the United States to execute a juvenile offender who was older

*Abbott* of Texas, *Mark L. Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia.

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Daniel Smirlock,* Deputy Solicitor General, and *Jean Lin* and *Julie Loughran,* Assistant Solicitors General, and by the Attorneys General for their respective States as follows: *Thomas J. Miller* of Iowa, *Phill Kline* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Mike Hatch* of Minnesota, *Patricia A. Madrid* of New Mexico, *Hardy Myers* of Oregon, and *Darrell V. McGraw, Jr.,* of West Virginia; for the American Bar Association by *Dennis W. Archer, Amy R. Sabrin,* and *Matthew W. S. Estes;* for the American Psychological Association et al. by *Drew S. Days III, Beth S. Brinkmann, Sherri N. Blount, Timothy C. Lambert, Nathalie F. P. Gilfoyle,* and *Lindsay Childress-Beatty;* for the Coalition for Juvenile Justice by *Joseph D. Tydings;* for the Constitution Project by *Laurie Webb Daniel* and *Virginia E. Sloan;* for the Human Rights Committee of the Bar of England and Wales et al. by *Michael Bochenek, Audrey J. Anderson, William H. Johnson,* and *Thomas H. Speedy Rice;* for the Juvenile Law Center et al. by *Marsha L. Levick, Lourdes M. Rosado, Steven A. Drizin, Barbara Bennett Woodhouse, Michael C. Small,* and *Jeffrey P. Kehne;* for the Missouri Ban Youth Executions Coalition by *Joseph W. Luby;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Theodore M. Shaw, Norman J. Chachkin, Miriam Gohara, Christina A. Swarns, Steven R. Shapiro,* and *Diann Y. Rust-Tierney;* for the United States Conference of Catholic Bishops et al. by *Mark E. Chopko* and *Michael F. Moses;* and for Former U. S. Diplomats Morton Abramowitz et al. by *Harold Hongju Koh, Donald Francis Donovan,* and *Stephen B. Bright.*

Briefs of *amici curiae* were filed for the European Union et al. by *Richard J. Wilson;* for the American Medical Association et al. by *Joseph T. McLaughlin, E. Joshua Rosenkranz,* and *Stephane M. Clare;* for the Justice for All Alliance by *Dan Cutrer;* for Murder Victims' Families for Reconciliation by *Kate Lowenstein;* for the National Legal Aid and Defender Association by *Michael Mello;* and for President James Earl Carter, Jr., et al. by *Thomas F. Geraghty.*

than 15 but younger than 18 when he committed a capital crime. In *Stanford* v. *Kentucky,* 492 U. S. 361 (1989), a divided Court rejected the proposition that the Constitution bars capital punishment for juvenile offenders in this age group. We reconsider the question.

## I

At the age of 17, when he was still a junior in high school, Christopher Simmons, the respondent here, committed murder. About nine months later, after he had turned 18, he was tried and sentenced to death. There is little doubt that Simmons was the instigator of the crime. Before its commission Simmons said he wanted to murder someone. In chilling, callous terms he talked about his plan, discussing it for the most part with two friends, Charles Benjamin and John Tessmer, then aged 15 and 16 respectively. Simmons proposed to commit burglary and murder by breaking and entering, tying up a victim, and throwing the victim off a bridge. Simmons assured his friends they could "get away with it" because they were minors.

The three met at about 2 a.m. on the night of the murder, but Tessmer left before the other two set out. (The State later charged Tessmer with conspiracy, but dropped the charge in exchange for his testimony against Simmons.) Simmons and Benjamin entered the home of the victim, Shirley Crook, after reaching through an open window and unlocking the back door. Simmons turned on a hallway light. Awakened, Mrs. Crook called out, "Who's there?" In response Simmons entered Mrs. Crook's bedroom, where he recognized her from a previous car accident involving them both. Simmons later admitted this confirmed his resolve to murder her.

Using duct tape to cover her eyes and mouth and bind her hands, the two perpetrators put Mrs. Crook in her minivan and drove to a state park. They reinforced the bindings, covered her head with a towel, and walked her to a rail-

road trestle spanning the Meramec River. There they tied her hands and feet together with electrical wire, wrapped her whole face in duct tape and threw her from the bridge, drowning her in the waters below.

By the afternoon of September 9, Steven Crook had returned home from an overnight trip, found his bedroom in disarray, and reported his wife missing. On the same afternoon fishermen recovered the victim's body from the river. Simmons, meanwhile, was bragging about the killing, telling friends he had killed a woman "because the bitch seen my face."

The next day, after receiving information of Simmons' involvement, police arrested him at his high school and took him to the police station in Fenton, Missouri. They read him his *Miranda* rights. Simmons waived his right to an attorney and agreed to answer questions. After less than two hours of interrogation, Simmons confessed to the murder and agreed to perform a videotaped reenactment at the crime scene.

The State charged Simmons with burglary, kidnaping, stealing, and murder in the first degree. As Simmons was 17 at the time of the crime, he was outside the criminal jurisdiction of Missouri's juvenile court system. See Mo. Rev. Stat. §§ 211.021 (2000) and 211.031 (Supp. 2003). He was tried as an adult. At trial the State introduced Simmons' confession and the videotaped reenactment of the crime, along with testimony that Simmons discussed the crime in advance and bragged about it later. The defense called no witnesses in the guilt phase. The jury having returned a verdict of murder, the trial proceeded to the penalty phase.

The State sought the death penalty. As aggravating factors, the State submitted that the murder was committed for the purpose of receiving money; was committed for the purpose of avoiding, interfering with, or preventing lawful arrest of the defendant; and involved depravity of mind and was outrageously and wantonly vile, horrible, and inhuman.

The State called Shirley Crook's husband, daughter, and two sisters, who presented moving evidence of the devastation her death had brought to their lives.

In mitigation Simmons' attorneys first called an officer of the Missouri juvenile justice system, who testified that Simmons had no prior convictions and that no previous charges had been filed against him. Simmons' mother, father, two younger half brothers, a neighbor, and a friend took the stand to tell the jurors of the close relationships they had formed with Simmons and to plead for mercy on his behalf. Simmons' mother, in particular, testified to the responsibility Simmons demonstrated in taking care of his two younger half brothers and of his grandmother and to his capacity to show love for them.

During closing arguments, both the prosecutor and defense counsel addressed Simmons' age, which the trial judge had instructed the jurors they could consider as a mitigating factor. Defense counsel reminded the jurors that juveniles of Simmons' age cannot drink, serve on juries, or even see certain movies, because "the legislatures have wisely decided that individuals of a certain age aren't responsible enough." Defense counsel argued that Simmons' age should make "a huge difference to [the jurors] in deciding just exactly what sort of punishment to make." In rebuttal, the prosecutor gave the following response: "Age, he says. Think about age. Seventeen years old. Isn't that scary? Doesn't that scare you? Mitigating? Quite the contrary I submit. Quite the contrary."

The jury recommended the death penalty after finding the State had proved each of the three aggravating factors submitted to it. Accepting the jury's recommendation, the trial judge imposed the death penalty.

Simmons obtained new counsel, who moved in the trial court to set aside the conviction and sentence. One argument was that Simmons had received ineffective assistance at trial. To support this contention, the new counsel called

as witnesses Simmons' trial attorney, Simmons' friends and neighbors, and clinical psychologists who had evaluated him.

Part of the submission was that Simmons was "very immature," "very impulsive," and "very susceptible to being manipulated or influenced." The experts testified about Simmons' background including a difficult home environment and dramatic changes in behavior, accompanied by poor school performance in adolescence. Simmons was absent from home for long periods, spending time using alcohol and drugs with other teenagers or young adults. The contention by Simmons' postconviction counsel was that these matters should have been established in the sentencing proceeding.

The trial court found no constitutional violation by reason of ineffective assistance of counsel and denied the motion for postconviction relief. In a consolidated appeal from Simmons' conviction and sentence, and from the denial of postconviction relief, the Missouri Supreme Court affirmed. *State* v. *Simmons*, 944 S. W. 2d 165, 169 (en banc), cert. denied, 522 U. S. 953 (1997). The federal courts denied Simmons' petition for a writ of habeas corpus. *Simmons* v. *Bowersox*, 235 F. 3d 1124, 1127 (CA8), cert. denied, 534 U. S. 924 (2001).

After these proceedings in Simmons' case had run their course, this Court held that the Eighth and Fourteenth Amendments prohibit the execution of a mentally retarded person. *Atkins* v. *Virginia*, 536 U. S. 304 (2002). Simmons filed a new petition for state postconviction relief, arguing that the reasoning of *Atkins* established that the Constitution prohibits the execution of a juvenile who was under 18 when the crime was committed.

The Missouri Supreme Court agreed. *State ex rel. Simmons* v. *Roper*, 112 S. W. 3d 397 (2003) (en banc). It held that since *Stanford*,

> "a national consensus has developed against the execution of juvenile offenders, as demonstrated by the fact that eighteen states now bar such executions for juve-

niles, that twelve other states bar executions altogether, that no state has lowered its age of execution below 18 since *Stanford*, that five states have legislatively or by case law raised or established the minimum age at 18, and that the imposition of the juvenile death penalty has become truly unusual over the last decade." 112 S. W. 3d, at 399.

On this reasoning it set aside Simmons' death sentence and resentenced him to "life imprisonment without eligibility for probation, parole, or release except by act of the Governor." *Id.*, at 413.

We granted certiorari, 540 U. S. 1160 (2004), and now affirm.

## II

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The provision is applicable to the States through the Fourteenth Amendment. *Furman* v. *Georgia*, 408 U. S. 238, 239 (1972) *(per curiam); Robinson* v. *California*, 370 U. S. 660, 666–667 (1962); *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 463 (1947) (plurality opinion). As the Court explained in *Atkins*, the Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions. The right flows from the basic " 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " 536 U. S., at 311 (quoting *Weems* v. *United States*, 217 U. S. 349, 367 (1910)). By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons.

The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this

framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual. *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958) (plurality opinion).

In *Thompson* v. *Oklahoma,* 487 U. S. 815 (1988), a plurality of the Court determined that our standards of decency do not permit the execution of any offender under the age of 16 at the time of the crime. *Id.,* at 818–838 (opinion of STEVENS, J., joined by Brennan, Marshall, and Blackmun, JJ.). The plurality opinion explained that no death penalty State that had given express consideration to a minimum age for the death penalty had set the age lower than 16. *Id.,* at 826–829. The plurality also observed that "[t]he conclusion that it would offend civilized standards of decency to execute ·a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community." *Id.,* at 830. The opinion further noted that juries imposed the death penalty on offenders under 16 with exceeding rarity; the last execution of an offender for a crime committed under the age of 16 had been carried out in 1948, 40 years prior. *Id.,* at 832–833.

Bringing its independent judgment to bear on the permissibility of the death penalty for a 15-year-old offender, the *Thompson* plurality stressed that "[t]he reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.,* at 835. According to the plurality, the lesser culpability of offenders under 16 made the death penalty inappropriate as a form of retribution, while the low likelihood that offenders under 16 engaged in "the kind of cost-benefit analysis that

attaches any weight to the possibility of execution" made the death penalty ineffective as a means of deterrence. *Id.*, at 836–838. With JUSTICE O'CONNOR concurring in the judgment on narrower grounds, *id.*, at 848–859, the Court set aside the death sentence that had been imposed on the 15-year-old offender.

The next year, in *Stanford v. Kentucky*, 492 U. S. 361 (1989), the Court, over a dissenting opinion joined by four Justices, referred to contemporary standards of decency in this country and concluded the Eighth and Fourteenth Amendments did not proscribe the execution of juvenile offenders over 15 but under 18. The Court noted that 22 of the 37 death penalty States permitted the death penalty for 16-year-old offenders, and, among these 37 States, 25 permitted it for 17-year-old offenders. These numbers, in the Court's view, indicated there was no national consensus "sufficient to label a particular punishment cruel and unusual." *Id.*, at 370–371. A plurality of the Court also "emphatically reject[ed]" the suggestion that the Court should bring its own judgment to bear on the acceptability of the juvenile death penalty. *Id.*, at 377–378 (opinion of SCALIA, J., joined by REHNQUIST, C. J., and White and KENNEDY, JJ.); see also *id.*, at 382 (O'CONNOR, J., concurring in part and concurring in judgment) (criticizing the plurality's refusal "to judge whether the ' "nexus between the punishment imposed and the defendant's blameworthiness" ' is proportional").

The same day the Court decided *Stanford*, it held that the Eighth Amendment did not mandate a categorical exemption from the death penalty for the mentally retarded. *Penry v. Lynaugh*, 492 U. S. 302 (1989). In reaching this conclusion it stressed that only two States had enacted laws banning the imposition of the death penalty on a mentally retarded person convicted of a capital offense. *Id.*, at 334. According to the Court, "the two state statutes prohibiting execution of the mentally retarded, even when added to the 14 States that have rejected capital punishment completely,

[did] not provide sufficient evidence at present of a national consensus." *Ibid.*

Three Terms ago the subject was reconsidered in *Atkins.* We held that standards of decency have evolved since *Penry* and now demonstrate that the execution of the mentally retarded is cruel and unusual punishment. The Court noted objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions of the mentally retarded. When *Atkins* was decided only a minority of States permitted the practice, and even in those States it was rare. 536 U. S., at 314–315. On the basis of these indicia the Court determined that executing mentally retarded offenders "has become truly unusual, and it is fair to say that a national consensus has developed against it." *Id.*, at 316.

The inquiry into our society's evolving standards of decency did not end there. The *Atkins* Court neither repeated nor relied upon the statement in *Stanford* that the Court's independent judgment has no bearing on the acceptability of a particular punishment under the Eighth Amendment. Instead we returned to the rule, established in decisions predating *Stanford*, that "'the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.'" 536 U. S., at 312 (quoting *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion)). Mental retardation, the Court said, diminishes personal culpability even if the offender can distinguish right from wrong. 536 U. S., at 318. The impairments of mentally retarded offenders make it less defensible to impose the death penalty as retribution for past crimes and less likely that the death penalty will have a real deterrent effect. *Id.*, at 319–320. Based on these considerations and on the finding of national consensus against executing the mentally retarded, the Court ruled that the death penalty constitutes an excessive sanction for the entire category of mentally retarded offend-

ers, and that the Eighth Amendment "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.*, at 321 (quoting *Ford* v. *Wainwright,* 477 U. S. 399, 405 (1986)).

Just as the *Atkins* Court reconsidered the issue decided in *Penry,* we now reconsider the issue decided in *Stanford.* The beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. These data give us essential instruction. We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment for juveniles.

## III

### A

The evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence *Atkins* held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded. When *Atkins* was decided, 30 States prohibited the death penalty for the mentally retarded. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the mentally retarded from its reach. 536 U. S., at 313–315. By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach. See Appendix A, *infra.* *Atkins* emphasized that even in the 20 States without formal prohibition, the practice of executing the mentally retarded was infrequent. Since *Penry,* only five States had executed offenders known to have an IQ under 70. 536 U. S., at 316. In the present case, too, even in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent. Since *Stanford,* six States have executed prisoners for crimes committed as ju-

veniles. In the past 10 years, only three have done so: Oklahoma, Texas, and Virginia. See V. Streib, The Juvenile Death Penalty Today: Death Sentences and Executions for Juvenile Crimes, January 1, 1973–December 31, 2004, No. 76, p. 4 (2005), available at http://www.law.onu.edu/faculty/streib/documents/JuvDeathDec2004.pdf (last updated Jan. 31, 2005) (as visited Feb. 25, 2005, and available in Clerk of Court's case file). In December 2003 the Governor of Kentucky decided to spare the life of Kevin Stanford, and commuted his sentence to one of life imprisonment without parole, with the declaration that " '[w]e ought not be executing people who, legally, were children.' " Lexington Herald Leader, Dec. 9, 2003, p. B3, 2003 WL 65043346. By this act the Governor ensured Kentucky would not add itself to the list of States that have executed juveniles within the last 10 years even by the execution of the very defendant whose death sentence the Court had upheld in *Stanford* v. *Kentucky.*

There is, to be sure, at least one difference between the evidence of consensus in *Atkins* and in this case. Impressive in *Atkins* was the rate of abolition of the death penalty for the mentally retarded. Sixteen States that permitted the execution of the mentally retarded at the time of *Penry* had prohibited the practice by the time we heard *Atkins.* By contrast, the rate of change in reducing the incidence of the juvenile death penalty, or in taking specific steps to abolish it, has been slower. Five States that allowed the juvenile death penalty at the time of *Stanford* have abandoned it in the intervening 15 years—four through legislative enactments and one through judicial decision. Streib, *supra,* at 5, 7; *State* v. *Furman,* 122 Wash. 2d 440, 858 P. 2d 1092 (1993) (en banc).

Though less dramatic than the change from *Penry* to *Atkins* ("telling," to borrow the word *Atkins* used to describe this difference, 536 U. S., at 315, n. 18), we still consider the change from *Stanford* to this case to be significant. As noted in *Atkins,* with respect to the States that had aban-

doned the death penalty for the mentally retarded since *Penry*, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." 536 U. S., at 315. In particular we found it significant that, in the wake of *Penry*, no State that had already prohibited the execution of the mentally retarded had passed legislation to reinstate the penalty. 536 U. S., at 315–316. The number of States that have abandoned capital punishment for juvenile offenders since *Stanford* is smaller than the number of States that abandoned capital punishment for the mentally retarded after *Penry;* yet we think the same consistency of direction of change has been demonstrated. Since *Stanford*, no State that previously prohibited capital punishment for juveniles has reinstated it. This fact, coupled with the trend toward abolition of the juvenile death penalty, carries special force in light of the general popularity of anticrime legislation, *Atkins, supra,* at 315, and in light of the particular trend in recent years toward cracking down on juvenile crime in other respects, see H. Snyder & M. Sickmund, National Center for Juvenile Justice, Juvenile Offenders and Victims: 1999 National Report 89, 133 (Sept. 1999); Scott & Grisso, The Evolution of Adolescence: A Developmental Perspective on Juvenile Justice Reform, 88 J. Crim. L. & C. 137, 148 (1997). Any difference between this case and *Atkins* with respect to the pace of abolition is thus counterbalanced by the consistent direction of the change.

The slower pace of abolition of the juvenile death penalty over the past 15 years, moreover, may have a simple explanation. When we heard *Penry*, only two death penalty States had already prohibited the execution of the mentally retarded. When we heard *Stanford*, by contrast, 12 death penalty States had already prohibited the execution of any juvenile under 18, and 15 had prohibited the execution of any juvenile under 17. If anything, this shows that the impropriety of executing juveniles between 16 and 18 years of age

gained wide recognition earlier than the impropriety of executing the mentally retarded. In the words of the Missouri Supreme Court: "It would be the ultimate in irony if the very fact that the inappropriateness of the death penalty for juveniles was broadly recognized sooner than it was recognized for the mentally retarded were to become a reason to continue the execution of juveniles now that the execution of the mentally retarded has been barred." 112 S. W. 3d, at 408, n. 10.

Petitioner cannot show national consensus in favor of capital punishment for juveniles but still resists the conclusion that any consensus exists against it. Petitioner supports this position with, in particular, the observation that when the Senate ratified the International Covenant on Civil and Political Rights (ICCPR), Dec. 19, 1966, 999 U. N. T. S. 171 (entered into force Mar. 23, 1976), it did so subject to the President's proposed reservation regarding Article 6(5) of that treaty, which prohibits capital punishment for juveniles. Brief for Petitioner 27. This reservation at best provides only faint support for petitioner's argument. First, the reservation was passed in 1992; since then, five States have abandoned capital punishment for juveniles. Second, Congress considered the issue when enacting the Federal Death Penalty Act in 1994, and determined that the death penalty should not extend to juveniles. See 18 U. S. C. § 3591. The reservation to Article 6(5) of the ICCPR provides minimal evidence that there is not now a national consensus against juvenile executions.

As in *Atkins*, the objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles, in the words *Atkins* used respecting the mentally retarded, as "categorically less culpable than the average criminal." 536 U. S., at 316.

### B

A majority of States have rejected the imposition of the death penalty on juvenile offenders under 18, and we now hold this is required by the Eighth Amendment.

Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force. *Thompson*, 487 U. S., at 856 (O'CONNOR, J., concurring in judgment). Capital punishment must be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution." *Atkins, supra*, at 319. This principle is implemented throughout the capital sentencing process. States must give narrow and precise definition to the aggravating factors that can result in a capital sentence. *Godfrey* v. *Georgia*, 446 U. S. 420, 428–429 (1980) (plurality opinion). In any capital case a defendant has wide latitude to raise as a mitigating factor "any aspect of [his or her] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982); see also *Johnson* v. *Texas*, 509 U. S. 350, 359–362 (1993) (summarizing the Court's jurisprudence after *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, with respect to a sentencer's consideration of aggravating and mitigating factors). There are a number of crimes that beyond question are severe in absolute terms, yet the death penalty may not be imposed for their commission. *Coker* v. *Georgia*, 433 U. S. 584 (1977) (rape of an adult woman); *Enmund* v. *Florida*, 458 U. S. 782 (1982) (felony murder where defendant did not kill, attempt to kill, or intend to kill). The death penalty may not be imposed on certain classes of offenders, such as juveniles under 16, the insane, and the mentally retarded, no matter how heinous the crime. *Thompson* v. *Oklahoma, supra; Ford* v. *Wainwright*, 477 U. S. 399 (1986); *Atkins, supra*. These rules vindicate the underlying princi-

ple that the death penalty is reserved for a narrow category of crimes and offenders.

Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Johnson, supra,* at 367; see also *Eddings, supra,* at 115–116 ("Even the normal 16-year-old customarily lacks the maturity of an adult"). It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339 (1992). In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent. See Appendixes B–D, *infra.*

The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. *Eddings, supra,* at 115 ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage"). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. See Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) (hereinafter Steinberg & Scott) ("[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968).

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson, supra*, at 835 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See *Stanford*, 492 U. S., at 395 (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson, supra*, at 368; see also Steinberg & Scott 1014 ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood").

In *Thompson*, a plurality of the Court recognized the import of these characteristics with respect to juveniles under 16, and relied on them to hold that the Eighth Amendment prohibited the imposition of the death penalty on juveniles

below that age. 487 U. S., at 833–838. We conclude the same reasoning applies to all juvenile offenders under 18.

Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults. We have held there are two distinct social purposes served by the death penalty: "'retribution and deterrence of capital crimes by prospective offenders.'" *Atkins*, 536 U. S., at 319 (quoting *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.)). As for retribution, we remarked in *Atkins* that "[i]f the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." 536 U. S., at 319. The same conclusions follow from the lesser culpability of the juvenile offender. Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult. Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.

As for deterrence, it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles, as counsel for petitioner acknowledged at oral argument. Tr. of Oral Arg. 48. In general we leave to legislatures the assessment of the efficacy of various criminal penalty schemes, see *Harmelin* v. *Michigan*, 501 U. S. 957, 998–999 (1991) (KENNEDY, J., concurring in part and concurring in judgment). Here, however, the absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence. In particular, as the plurality observed in

*Thompson,* "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." 487 U. S., at 837. To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.

In concluding that neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders, we cannot deny or overlook the brutal crimes too many juvenile offenders have committed. See Brief for Alabama et al. as *Amici Curiae.* Certainly it can be argued, although we by no means concede the point, that a rare case might arise in which a juvenile offender has sufficient psychological maturity, and at the same time demonstrates sufficient depravity, to merit a sentence of death. Indeed, this possibility is the linchpin of one contention pressed by petitioner and his *amici.* They assert that even assuming the truth of the observations we have made about juveniles' diminished culpability in general, jurors nonetheless should be allowed to consider mitigating arguments related to youth on a case-by-case basis, and in some cases to impose the death penalty if justified. A central feature of death penalty sentencing is a particular assessment of the circumstances of the crime and the characteristics of the offender. The system is designed to consider both aggravating and mitigating circumstances, including youth, in every case. Given this Court's own insistence on individualized consideration, petitioner maintains that it is both arbitrary and unnecessary to adopt a categorical rule barring imposition of the death penalty on any offender under 18 years of age.

We disagree. The differences between juvenile and adult offenders are too marked and well understood to risk allow-

ing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him. In this very case, as we noted above, the prosecutor argued Simmons' youth was aggravating rather than mitigating. *Supra*, at 558. While this sort of overreaching could be corrected by a particular rule to ensure that the mitigating force of youth is not overlooked, that would not address our larger concerns.

It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. See Steinberg & Scott 1014–1016. As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy, and which is characterized by callousness, cynicism, and contempt for the feelings, rights, and suffering of others. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701–706 (4th ed. text rev. 2000); see also Steinberg & Scott 1015. If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation—that a juvenile offender merits the death penalty. When a juvenile offender commits a heinous crime, the State can exact forfeiture of some

of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity.

Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

These considerations mean *Stanford* v. *Kentucky* should be deemed no longer controlling on this issue. To the extent *Stanford* was based on review of the objective indicia of consensus that obtained in 1989, 492 U. S., at 370–371, it suffices to note that those indicia have changed. *Supra*, at 564–567. It should be observed, furthermore, that the *Stanford* Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty, 492 U. S., at 370, n. 2; a State's decision to bar the death penalty altogether of necessity demonstrates a judgment that the death penalty is inappropriate for all offenders, including juveniles. Last, to the extent *Stanford* was based on a rejection of the idea that this Court is required to bring its independent judgment to bear on the proportionality of the death penalty for a particular class of crimes or offenders, *id.*, at 377–378 (plurality opinion), it suffices to note that this rejection was inconsistent with prior Eighth Amendment decisions, *Thompson*, 487 U. S., at 833–

838 (plurality opinion); *Enmund*, 458 U. S., at 797; *Coker*, 433 U. S., at 597 (plurality opinion). It is also inconsistent with the premises of our recent decision in *Atkins*. 536 U. S., at 312–313, 317–321.

In holding that the death penalty cannot be imposed upon juvenile offenders, we take into account the circumstance that some States have relied on *Stanford* in seeking the death penalty against juvenile offenders. This consideration, however, does not outweigh our conclusion that *Stanford* should no longer control in those few pending cases or in those yet to arise.

IV

Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty. This reality does not become controlling, for the task of interpreting the Eighth Amendment remains our responsibility. Yet at least from the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of "cruel and unusual punishments." 356 U. S., at 102–103 (plurality opinion) ("The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime"); see also *Atkins, supra,* at 317, n. 21 (recognizing that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved"); *Thompson, supra,* at 830–831, and n. 31 (plurality opinion) (noting the abolition of the juvenile death penalty "by other nations that share our Anglo-American heritage, and by the leading members of the Western European community," and observing that "[w]e have previously recognized the relevance of the views of the international commu-

nity in determining whether a punishment is cruel and unusual"); Enmund, supra, at 796–797, n. 22 (observing that "the doctrine of felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe"); Coker, supra, at 596, n. 10 (plurality opinion) ("It is . . . not irrelevant here that out of 60 major nations in the world surveyed in 1965, only 3 retained the death penalty for rape where death did not ensue").

As respondent and a number of amici emphasize, Article 37 of the United Nations Convention on the Rights of the Child, which every country in the world has ratified save for the United States and Somalia, contains an express prohibition on capital punishment for crimes committed by juveniles under 18. United Nations Convention on the Rights of the Child, Art. 37, Nov. 20, 1989, 1577 U. N. T. S. 3, 28 I. L. M. 1448, 1468–1470 (entered into force Sept. 2, 1990); Brief for Respondent 48; Brief for European Union et al. as Amici Curiae 12–13; Brief for President James Earl Carter, Jr., et al. as Amici Curiae 9; Brief for Former U. S. Diplomats Morton Abramowitz et al. as Amici Curiae 7; Brief for Human Rights Committee of the Bar of England and Wales et al. as Amici Curiae 13–14. No ratifying country has entered a reservation to the provision prohibiting the execution of juvenile offenders. Parallel prohibitions are contained in other significant international covenants. See ICCPR, Art. 6(5), 999 U. N. T. S., at 175 (prohibiting capital punishment for anyone under 18 at the time of offense) (signed and ratified by the United States subject to a reservation regarding Article 6(5), as noted, supra, at 567); American Convention on Human Rights: Pact of San José, Costa Rica, Art. 4(5), Nov. 22, 1969, 1144 U. N. T. S. 146 (entered into force July 19, 1978) (same); African Charter on the Rights and Welfare of the Child, Art. 5(3), OAU Doc. CAB/LEG/ 24.9/49 (1990) (entered into force Nov. 29, 1999) (same).

Respondent and his *amici* have submitted, and petitioner does not contest, that only seven countries other than the United States have executed juvenile offenders since 1990: Iran, Pakistan, Saudi Arabia, Yemen, Nigeria, the Democratic Republic of Congo, and China. Since then each of these countries has either abolished capital punishment for juveniles or made public disavowal of the practice. Brief for Respondent 49–50. In sum, it is fair to say that the United States now stands alone in a world that has turned its face against the juvenile death penalty.

Though the international covenants prohibiting the juvenile death penalty are of more recent date, it is instructive to note that the United Kingdom abolished the juvenile death penalty before these covenants came into being. The United Kingdom's experience bears particular relevance here in light of the historic ties between our countries and in light of the Eighth Amendment's own origins. The Amendment was modeled on a parallel provision in the English Declaration of Rights of 1689, which provided: "[E]xcessive Bail ought not to be required nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 W. & M., ch. 2, § 10, in 3 Eng. Stat. at Large 441 (1770); see also *Trop, supra*, at 100 (plurality opinion). As of now, the United Kingdom has abolished the death penalty in its entirety; but, decades before it took this step, it recognized the disproportionate nature of the juvenile death penalty; and it abolished that penalty as a separate matter. In 1930 an official committee recommended that the minimum age for execution be raised to 21. House of Commons Report from the Select Committee on Capital Punishment (1930), 193, p. 44. Parliament then enacted the Children and Young Person's Act of 1933, 23 Geo. 5, ch. 12, which prevented execution of those aged 18 at the date of the sentence. And in 1948, Parliament enacted the Criminal Justice Act, 11 & 12 Geo. 6, ch. 58, prohibiting the execution of any person under 18 at the time of the offense. In the 56 years that have passed

since the United Kingdom abolished the juvenile death penalty, the weight of authority against it there, and in the international community, has become well established.

It is proper that we acknowledge the overwhelming weight of international opinion against the juvenile death penalty, resting in large part on the understanding that the instability and emotional imbalance of young people may often be a factor in the crime. See Brief for Human Rights Committee of the Bar of England and Wales et al. as *Amici Curiae* 10–11. The opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our own conclusions.

Over time, from one generation to the next, the Constitution has come to earn the high respect and even, as Madison dared to hope, the veneration of the American people. See The Federalist No. 49, p. 314 (C. Rossiter ed. 1961). The document sets forth, and rests upon, innovative principles original to the American experience, such as federalism; a proven balance in political mechanisms through separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and preserve human dignity. These doctrines and guarantees are central to the American experience and remain essential to our present-day self-definition and national identity. Not the least of the reasons we honor the Constitution, then, is because we know it to be our own. It does not lessen our fidelity to the Constitution or our pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores the centrality of those same rights within our own heritage of freedom.

\* \* \*

The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed. The judgment

of the Missouri Supreme Court setting aside the sentence of death imposed upon Christopher Simmons is affirmed.

*It is so ordered.*

## APPENDIX A TO OPINION OF THE COURT

### I. STATES THAT PERMIT THE IMPOSITION OF THE DEATH PENALTY ON JUVENILES

| | |
|---|---|
| Alabama | Ala. Code § 13A–6–2(c) (West 2004) (no express minimum age) |
| Arizona | Ariz. Rev. Stat. Ann. § 13–703(A) (West Supp. 2004) (same) |
| Arkansas | Ark. Code Ann. § 5–4–615 (Michie 1997) (same) |
| Delaware | Del. Code Ann., Tit. 11 (Lexis 1995) (same) |
| Florida | Fla. Stat. § 985.225(1) (2003) (same) |
| Georgia | Ga. Code Ann. § 17–9–3 (Lexis 2004) (same) |
| Idaho | Idaho Code § 18–4004 (Michie 2004) (same) |
| Kentucky | Ky. Rev. Stat. Ann. § 640.040(1) (Lexis 1999) (minimum age of 16) |
| Louisiana | La. Stat. Ann. § 14:30(C) (West Supp. 2005) (no express minimum age) |
| Mississippi | Miss. Code Ann. § 97–3–21 (Lexis 2000) (same) |
| Missouri | Mo. Rev. Stat. Ann. § 565.020 (2000) (minimum age of 16) |
| Nevada | Nev. Rev. Stat. § 176.025 (2003) (minimum age of 16) |
| New Hampshire | N. H. Rev. Stat. Ann. § 630:1(V) (West 1996) (minimum age of 17) |
| North Carolina | N. C. Gen. Stat. § 14–17 (Lexis 2003) (minimum age of 17, except that those under 17 who commit murder while serving a prison sentence for a previous murder may receive the death penalty) |
| Oklahoma | Okla. Stat. Ann., Tit. 21, § 701.10 (West 2002) (no express minimum age) |
| Pennsylvania | 18 Pa. Cons. Stat. § 1102 (2002) (same) |
| South Carolina | S. C. Code Ann. § 16–3–20 (West Supp. 2004 and main ed.) (same) |
| Texas | Tex. Penal Code Ann. § 8.07(c) (West Supp. 2004–2005) (minimum age of 17) |
| Utah | Utah Code Ann. § 76–3–206(1) (Lexis 2003) (no express minimum age) |

Virginia Va. Code Ann. § 18.2–10(a) (Lexis 2004) (minimum age of 16)

## II. STATES THAT RETAIN THE DEATH PENALTY, BUT SET THE MINIMUM AGE AT 18

| | |
|---|---|
| California | Cal. Penal Code Ann. § 190.5 (West 1999) |
| Colorado | Colo. Rev. Stat. § 18–1.4–102(1)(a) (Lexis 2004) |
| Connecticut | Conn. Gen. Stat. § 53a–46a(h) (2005) |
| Illinois | Ill. Comp. Stat., ch. 720, § 5/9–1(b) (West Supp. 2003) |
| Indiana | Ind. Code Ann. § 35–50–2–3 (2004) |
| Kansas | Kan. Stat. Ann. § 21–4622 (1995) |
| Maryland | Md. Crim. Law Code Ann. § 2–202(b)(2)(i) (Lexis 2002) |
| Montana | Mont. Code Ann. § 45–5–102 (2003) |
| Nebraska | Neb. Rev. Stat. § 28–105.01(1) (Supp. 2004) |
| New Jersey | N. J. Stat. Ann. § 2C:11–3(g) (West Supp. 2003) |
| New Mexico | N. M. Stat. Ann. § 31–18–14(A) (2000) |
| New York | N. Y. Penal Law Ann. § 125.27 (West 2004) |
| Ohio | Ohio Rev. Code Ann. § 2929.02(A) (Lexis 2003) |
| Oregon | Ore. Rev. Stat. §§ 161.620, 137.707(2) (2003) |
| South Dakota | S. D. Codified Laws § 23A–27A–42 (West 2004) |
| Tennessee | Tenn. Code Ann. § 37–1–134(a)(1) (1996) |
| Washington | Minimum age of 18 established by judicial decision. *State* v. *Furman*, 122 Wash. 2d 440, 858 P. 2d 1092 (1993) |
| Wyoming | Wyo. Stat. § 6–2–101(b) (Lexis Supp. 2004) |

\* \* \*

During the past year, decisions by the highest courts of Kansas and New York invalidated provisions in those States' death penalty statutes. *State* v. *Marsh*, 278 Kan. 520, 102 P. 3d 445 (2004) (invalidating provision that required imposition of the death penalty if aggravating and mitigating circumstances were found to be in equal balance); *People* v. *LaValle*, 3 N. Y. 3d 88, 817 N. E. 2d 341 (2004) (invalidating mandatory requirement to instruct the jury that, in the case of jury deadlock as to the appropriate sentence in a capital case, the defendant would receive a sentence of life imprisonment with parole eligibility after serving a minimum of 20 to 25 years). Due to these decisions, it would appear that in these States the death penalty remains on the books, but that as a practical matter it might not be imposed on anyone until there is a change of course in these decisions, or until the respective state legislatures remedy the problems the courts have identified. *Marsh*, *supra*, at 524–526, 544–546, 102 P. 3d, at 452, 464; *LaValle*, *supra*, at 99, 817 N. E. 2d, at 344.

## III. STATES WITHOUT THE DEATH PENALTY

Alaska
Hawaii
Iowa
Maine
Massachusetts
Michigan
Minnesota
North Dakota
Rhode Island
Vermont
West Virginia
Wisconsin

## APPENDIX B TO OPINION OF THE COURT

### STATE STATUTES ESTABLISHING A MINIMUM AGE TO VOTE

| STATE | AGE | STATUTE |
|-------|-----|---------|
| Alabama | 18 | Ala. Const., Amdt. No. 579 |
| Alaska | 18 | Alaska Const., Art. V, §1; Alaska Stat. §15–05.010 (Lexis 2004) |
| Arizona | 18 | Ariz. Const., Art. VII, §2; Ariz. Rev. Stat. §16–101 (West 2001) |
| Arkansas | 18 | Ark. Code Ann. §9–25–101 (Lexis 2002) |
| California | 18 | Cal. Const., Art. 2, §2 |
| Colorado | 18 | Colo. Rev. Stat. §1–2–101 (Lexis 2004) |
| Connecticut | 18 | Conn. Const., Art. 6, §1; Conn. Gen. Stat. §9–12 (2005) |
| Delaware | 18 | Del. Code Ann., Tit. 15, §1701 (Michie Supp. 2004) |
| District of Columbia | 18 | D. C. Code §1–1001.02(2)(B) (West Supp. 2004) |
| Florida | 18 | Fla. Stat. ch. 97.041 (2003) |
| Georgia | 18 | Ga. Const., Art. 2, §1, ¶2; Ga. Code Ann. §21–2–216 (Lexis 2003) |
| Hawaii | | Haw. Const., Art. II, §1; Haw. Rev. Stat. §11–12 (1995) |
| Idaho | 18 | Idaho Code §34–402 (Michie 2001) |
| Illinois | 18 | Ill. Const., Art. III, §1; Ill. Comp. Stat., ch. 10, §5/3–1 (West 2002) |
| Indiana | 18 | Ind. Code Ann. §3–7–13–1 (2004) |
| Iowa | 18 | Iowa Code §48A.5 (2003) |

| | | |
|---|---|---|
| Kansas | 18 | Kan. Const., Art. 5, § 1 |
| Kentucky | 18 | Ky. Const. § 145 |
| Louisiana | 18 | La. Const., Art. I, § 10; La. Rev. Stat. Ann. § 18:101 (West 2004) |
| Maine | 18 | Me. Const., Art. II, § 1 (West Supp. 2004); Me. Rev. Stat. Ann., Tit. 21–A, §§ 111, 111–A (West 1993 and Supp. 2004) |
| Maryland | 18 | Md. Elec. Law Code Ann. § 3–102 (Lexis 2002) |
| Massachusetts | 18 | Mass. Gen. Laws Ann., ch. 51, § 1 (West Supp. 2005) |
| Michigan | 18 | Mich. Comp. Laws Ann. § 168.492 (West 1989) |
| Minnesota | 18 | Minn. Stat. § 201.014(1)(a) (2004) |
| Mississippi | 18 | Miss. Const., Art. 12, § 241 |
| Missouri | 18 | Mo. Const., Art. VIII, § 2 |
| Montana | 18 | Mont. Const., Art. IV, § 2; Mont. Code Ann. § 13–1–111 (2003) |
| Nebraska | 18 | Neb. Const., Art. VI, § 1; Neb. Rev. Stat. § 32–110 (2004) |
| Nevada | 18 | Nev. Rev. Stat. § 293.485 (2003) |
| New Hampshire | 18 | N. H. Const., Pt. 1, Art. 11 |
| New Jersey | 18 | N. J. Const., Art. II, § 1, ¶ 3 |
| New Mexico | 18 | [no provision other than U. S. Const., Amdt. XXVI] |
| New York | 18 | N. Y. Elec. Law Ann. § 5–102 (West 1998) |
| North Carolina | 18 | N. C. Gen. Stat. Ann. § 163–55 (Lexis 2003) |
| North Dakota | 18 | N. D. Const., Art. II, § 1 |
| Ohio | 18 | Ohio Const., Art. V, § 1; Ohio Rev. Code Ann. § 3503.01 (Anderson 1996) |
| Oklahoma | 18 | Okla. Const., Art. III, § 1 |
| Oregon | 18 | Ore. Const., Art. II, § 2 |
| Pennsylvania | 18 | 25 Pa. Cons. Stat. Ann. § 2811 (1994) |
| Rhode Island | 18 | R. I. Gen. Laws § 17–1–3 (Lexis 2003) |
| South Carolina | 18 | S. C. Code Ann. § 7–5–610 (West Supp. 2004) |
| South Dakota | 18 | S. D. Const., Art. VII, § 2; S. D. Codified Laws Ann. § 12–3–1 (West 2004) |
| Tennessee | 18 | Tenn. Code Ann. § 2–2–102 (2003) |
| Texas | 18 | Tex. Elec. Code Ann. § 11.002 (West 2003) |
| Utah | 18 | Utah Const., Art. IV, § 2; Utah Code Ann. § 20A–2–101 (Lexis 2003) |
| Vermont | 18 | Vt. Stat. Ann., Tit. 17, § 2121 (Lexis 2002) |

| Virginia | 18 | Va. Const., Art. II, §1 |
| Washington | 18 | Wash. Const., Art. VI, §1 |
| West Virginia | 18 | W. Va. Code §3–1–3 (Lexis 2002) |
| Wisconsin | 18 | Wis. Const., Art. III, §1; Wis. Stat. §6.02 (West 2004) |
| Wyoming | 18 | Wyo. Stat. Ann. §§22–1–102, 22–3–102 (Lexis Supp. 2004) |

\* \* \*

The Twenty-Sixth Amendment to the Constitution of the United States provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

## APPENDIX C TO OPINION OF THE COURT

### STATE STATUTES ESTABLISHING A MINIMUM AGE FOR JURY SERVICE

| STATE | AGE | STATUTE |
| --- | --- | --- |
| Alabama | 19 | Ala. Code §12–16–60(a)(1) (West 1995) |
| Alaska | 18 | Alaska Stat. §09.20.010(a)(3) (Lexis 2004) |
| Arizona | 18 | Ariz. Rev. Stat. §21–301(D) (West 2002) |
| Arkansas | 18 | Ark. Code Ann. §§16–31–101, 16–32–302 (Lexis Supp. 2003) |
| California | 18 | Cal. Civ. Proc. §203(a)(2) (West Supp. 2005) |
| Colorado | 18 | Colo. Rev. Stat. §13–71–105(2)(a) (Lexis 2004) |
| Connecticut | 18 | Conn. Gen. Stat. §51–217(a) (2005) |
| Delaware | 18 | Del. Code Ann., Tit. 10, §4509(b)(2) (Michie 1999) |
| District of Columbia | 18 | D. C. Code §11–1906(b)(1)(C) (West 2001) |
| Florida | 18 | Fla. Stat. §40.01 (2003) |
| Georgia | 18 | Ga. Code Ann. §§15–12–60, 15–12–163 (Lexis 2001) |
| Hawaii | 18 | Haw. Rev. Stat. §612–4(a)(1) (Supp. 2004) |
| Idaho | 18 | Idaho Code §2–209(2)(a) (Michie 2004) |
| Illinois | 18 | Ill. Comp. Stat., ch. 705, §305/2 (West 2002) |
| Indiana | 18 | Ind. Code §33–28–4–8 (2004) |
| Iowa | 18 | Iowa Code §607A.4(1)(a) (2003) |
| Kansas | 18 | Kan. Stat. Ann. §43–156 (2000) (jurors must be qualified to be electors); Kan. Const., Art. 5, §1 (person must be 18 to be qualified elector) |

| | | |
|---|---|---|
| Kentucky | 18 | Ky. Rev. Stat. Ann. § 29A.080(2)(a) (Lexis Supp. 2004) |
| Louisiana | 18 | La. Code Crim. Proc. Ann., Art. 401(A)(2) (West 2003) |
| Maine | 18 | Me. Rev. Stat. Ann., Tit. 14, § 1211 (West 1980) |
| Maryland | 18 | Md. Cts. & Jud. Proc. Code Ann. § 8–104 (Lexis 2002) |
| Massachusetts | 18 | Mass. Gen. Laws Ann., ch. 234, § 1 (West 2000) (jurors must be qualified to vote); ch. 51, § 1 (West Supp. 2005) (person must be 18 to vote) |
| Michigan | 18 | Mich. Comp. Laws Ann. § 600.1307a(1)(a) (West Supp. 2004) |
| Minnesota | 18 | Minn. Dist. Ct. Rule 808(b)(2) (2004) |
| Mississippi | 21 | Miss. Code Ann. § 13–5–1 (Lexis 2002) |
| Missouri | 21 | Mo. Rev. Stat. § 494.425(1) (2000) |
| Montana | 18 | Mont. Code Ann. § 3–15–301 (2003) |
| Nebraska | 19 | Neb. Rev. Stat. § 25–1601 (Supp. 2004) |
| Nevada | 18 | Nev. Rev. Stat. § 6.010 (2003) (juror must be qualified elector); § 293.485 (person must be 18 to vote) |
| New Hampshire | 18 | N. H. Rev. Stat. Ann. § 500–A:7–a(I) (Lexis Supp. 2004) |
| New Jersey | 18 | N. J. Stat. Ann. § 2B:20–1(a) (West 2004 Pamphlet) |
| New Mexico | 18 | N. M. Stat. Ann. § 38–5–1 (1998) |
| New York | 18 | N. Y. Jud. Law Ann. § 510(2) (West 2003) |
| North Carolina | 18 | N. C. Gen. Stat. Ann. § 9–3 (Lexis 2003) |
| North Dakota | 18 | N. D. Cent. Code § 27–09.1–08(2)(b) (Lexis Supp. 2003) |
| Ohio | 18 | Ohio Rev. Code Ann. § 2313.42 (Anderson 2001) |
| Oklahoma | 18 | Okla. Stat. Ann., Tit. 38, § 28 (West Supp. 2005) |
| Rhode Island | 18 | R. I. Gen. Laws § 9–9–1.1(a)(2) (Lexis Supp. 2005) |
| South Carolina | 18 | S. C. Code Ann. § 14–7–130 (West Supp. 2004) |
| South Dakota | 18 | S. D. Codified Laws § 16–13–10 (2004) |
| Tennessee | 18 | Tenn. Code Ann. § 22–1–101 (1994) |
| Texas | 18 | Tex. Govt. Code Ann. § 62.102(1) (West 1998) |
| Utah | 18 | Utah Code Ann. § 78–46–7(1)(b) (Lexis 2002) |
| Vermont | 18 | Vt. Stat. Ann., Tit. 4, § 962(a)(1) (Lexis 1999) (jurors must have attained age of majority); Tit. 1, § 173 (Lexis 2003) (age of majority is 18) |

| Virginia | 18 | Va. Code Ann. § 8.01–337 (Lexis 2000) |
| Washington | 18 | Wash. Rev. Code Ann. § 2.36.070 (West 2004) |
| West Virginia | 18 | W. Va. Code § 52–1–8(b)(1) (Lexis 2000) |
| Wisconsin | 18 | Wis. Stat. § 756.02 (West 2001) |
| Wyoming | 18 | Wyo. Stat. Ann. § 1–11–101 (Lexis 2003) (jurors must be adults); § 14–1–101 (person becomes an adult at 18) |

## APPENDIX D TO OPINION OF THE COURT

### STATE STATUTES ESTABLISHING A MINIMUM AGE FOR MARRIAGE WITHOUT PARENTAL OR JUDICIAL CONSENT

| STATE | AGE | STATUTE |
| --- | --- | --- |
| Alabama | 18 | Ala. Code § 30–1–5 (West Supp. 2004) |
| Alaska | 18 | Alaska Stat. §§ 25.05.011, 25.05.171 (Lexis 2004) |
| Arizona | 18 | Ariz. Rev. Stat. Ann. § 25–102 (West Supp. 2004) |
| Arkansas | 18 | Ark. Code Ann. §§ 9–11–102, 9–11–208 (Lexis 2002) |
| California | 18 | Cal. Fam. Code Ann. § 301 (West 2004) |
| Colorado | 18 | Colo. Rev. Stat. Ann. § 14–2–106 (Lexis 2004) |
| Connecticut | 18 | Conn. Gen. Stat. § 46b–30 (2005) |
| Delaware | 18 | Del. Code Ann., Tit. 13, § 123 (Lexis 1999) |
| District of Columbia | 18 | D. C. Code § 46–411 (West 2001) |
| Florida | 18 | Fla. Stat. §§ 741.04, 741.0405 (2003) |
| Georgia | 16 | Ga. Code Ann. §§ 19–3–2, 19–3–37 (Lexis 2004) (those under 18 must obtain parental consent unless female applicant is pregnant or both applicants are parents of a living child, in which case minimum age to marry without consent is 16) |
| Hawaii | 18 | Haw. Rev. Stat. § 572–2 (1993) |
| Idaho | 18 | Idaho Code § 32–202 (Michie 1996) |
| Illinois | 18 | Ill. Comp. Stat., ch. 750, § 5/203 (West 2002) |
| Indiana | 18 | Ind. Code Ann. §§ 31–11–1–4, 31–11–1–5, 31–11–2–1, 31–11–2–3 (2004) |
| Iowa | 18 | Iowa Code § 595.2 (2003) |
| Kansas | 18 | Kan. Stat. Ann. § 23–106 (Supp. 2003) |
| Kentucky | 18 | Ky. Rev. Stat. Ann. §§ 402.020, 402.210 (Lexis 1999) |
| Louisiana | 18 | La. Children's Code Ann., Arts. 1545, 1547 (West 2004) (minors may not marry without |

consent); La. Civ. Code Ann., Art. 29 (West 1999) (age of majority is 18)

| | | |
|---|---|---|
| Maine | 18 | Me. Rev. Stat. Ann., Tit. 19-A, § 652 (West 1998 and Supp. 2004) |
| Maryland | 16 | Md. Fam. Law Code Ann. § 2-301 (Lexis 2004) (those under 18 must obtain parental consent unless female applicant can present proof of pregnancy or a child, in which case minimum age to marry without consent is 16) |
| Massachusetts | 18 | Mass. Gen. Laws Ann., ch. 207, §§ 7, 24, 25 (West 1998) |
| Michigan | 18 | Mich. Comp. Laws Ann. § 551.103 (West 2005) |
| Minnesota | 18 | Minn. Stat. § 517.02 (2004) |
| Mississippi | 15/17 | Miss. Code Ann. § 93-1-5 (Lexis 2004) (female applicants must be 15; male applicants must be 17) |
| Missouri | 18 | Mo. Rev. Stat. § 451.090 (2000) |
| Montana | 18 | Mont. Code Ann. §§ 40-1-202, 40-1-213 (2003) |
| Nebraska | 19 | Neb. Rev. Stat. § 42-105 (2004) (minors must have parental consent to marry); § 43-2101 (defining "minor" as a person under 19) |
| Nevada | 18 | Nev. Rev. Stat. § 122.020 (2003) |
| New Hampshire | 18 | N. H. Rev. Stat. Ann. § 457:5 (West 1992) |
| New Jersey | 18 | N. J. Stat. Ann. § 37:1-6 (West 2002) |
| New Mexico | 18 | N. M. Stat. Ann. § 40-1-6 (1999) |
| New York | 18 | N. Y. Dom. Rel. Law Ann. § 15 (West Supp. 2005) |
| North Carolina | 18 | N. C. Gen. Stat. Ann. § 51-2 (Lexis 2003) |
| North Dakota | 18 | N. D. Cent. Code § 14-03-02 (Lexis 2004) |
| Ohio | 18 | Ohio Rev. Code Ann. § 3101.01 (2003) |
| Oklahoma | 18 | Okla. Stat. Ann., Tit. 43, § 3 (West Supp. 2005) |
| Oregon | 18 | Ore. Rev. Stat. § 106.060 (2003) |
| Pennsylvania | 18 | 23 Pa. Cons. Stat. § 1304 (1997) |
| Rhode Island | 18 | R. I. Gen. Laws § 15-2-11 (Supp. 2004) |
| South Carolina | 18 | S. C. Code Ann. § 20-1-250 (West Supp. 2004) |
| South Dakota | 18 | S. D. Codified Laws § 25-1-9 (West 2004) |
| Tennessee | 18 | Tenn. Code Ann. § 36-3-106 (1996) |
| Texas | 18 | Tex. Fam. Code Ann. §§ 2.101-2.103 (West 1998) |
| Utah | 18 | Utah Code Ann. § 30-1-9 (Lexis Supp. 2004) |
| Vermont | 18 | Vt. Stat. Ann., Tit. 18, § 5142 (Lexis 2000) |

| Virginia | 18 | Va. Code Ann. §§ 20–45.1, 20–48, 20–49 (Lexis 2004) |
| Washington | 18 | Wash. Rev. Code Ann. § 26.04.210 (West 2005) |
| West Virginia | 18 | W. Va. Code § 48–2–301 (Lexis 2004) |
| Wisconsin | 18 | Wis. Stat. § 765.02 (2001) |
| Wyoming | 18 | Wyo. Stat. Ann. § 20–1–102 (Lexis 2003) |

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring.

Perhaps even more important than our specific holding today is our reaffirmation of the basic principle that informs the Court's interpretation of the Eighth Amendment. If the meaning of that Amendment had been frozen when it was originally drafted, it would impose no impediment to the execution of 7-year-old children today. See *Stanford* v. *Kentucky*, 492 U. S. 361, 368 (1989) (describing the common law at the time of the Amendment's adoption). The evolving standards of decency that have driven our construction of this critically important part of the Bill of Rights foreclose any such reading of the Amendment. In the best tradition of the common law, the pace of that evolution is a matter for continuing debate; but that our understanding of the Constitution does change from time to time has been settled since John Marshall breathed life into its text. If great lawyers of his day—Alexander Hamilton, for example—were sitting with us today, I would expect them to join JUSTICE KENNEDY's opinion for the Court. In all events, I do so without hesitation.

JUSTICE O'CONNOR, dissenting.

The Court's decision today establishes a categorical rule forbidding the execution of any offender for any crime committed before his 18th birthday, no matter how deliberate, wanton, or cruel the offense. Neither the objective evidence of contemporary societal values, nor the Court's moral proportionality analysis, nor the two in tandem suffice to justify this ruling.

Although the Court finds support for its decision in the fact that a majority of the States now disallow capital punishment of 17-year-old offenders, it refrains from asserting that its holding is compelled by a genuine national consensus. Indeed, the evidence before us fails to demonstrate conclusively that any such consensus has emerged in the brief period since we upheld the constitutionality of this practice in *Stanford* v. *Kentucky,* 492 U. S. 361 (1989).

Instead, the rule decreed by the Court rests, ultimately, on its independent moral judgment that death is a disproportionately severe punishment for any 17-year-old offender. I do not subscribe to this judgment. Adolescents *as a class* are undoubtedly less mature, and therefore less culpable for their misconduct, than adults. But the Court has adduced no evidence impeaching the seemingly reasonable conclusion reached by many state legislatures: that at least *some* 17-year-old murderers are sufficiently mature to deserve the death penalty in an appropriate case. Nor has it been shown that capital sentencing juries are incapable of accurately assessing a youthful defendant's maturity or of giving due weight to the mitigating characteristics associated with youth.

On this record—and especially in light of the fact that so little has changed since our recent decision in *Stanford*—I would not substitute our judgment about the moral propriety of capital punishment for 17-year-old murderers for the judgments of the Nation's legislatures. Rather, I would demand a clearer showing that our society truly has set its face against this practice before reading the Eighth Amendment categorically to forbid it.

## I

### A

Let me begin by making clear that I agree with much of the Court's description of the general principles that guide our Eighth Amendment jurisprudence. The Amendment

bars not only punishments that are inherently "'barbaric,'" but also those that are "'excessive' in relation to the crime committed." *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion). A sanction is therefore beyond the State's authority to inflict if it makes "no measurable contribution" to acceptable penal goals or is "grossly out of proportion to the severity of the crime." *Ibid.* The basic "precept of justice that punishment for crime should be . . . proportioned to [the] offense," *Weems* v. *United States*, 217 U. S. 349, 367 (1910), applies with special force to the death penalty. In capital cases, the Constitution demands that the punishment be tailored both to the nature of the crime itself and to the defendant's "personal responsibility and moral guilt." *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982); see also *id.*, at 825 (O'CONNOR, J., dissenting); *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987); *Eddings* v. *Oklahoma*, 455 U. S. 104, 111–112 (1982).

It is by now beyond serious dispute that the Eighth Amendment's prohibition of "cruel and unusual punishments" is not a static command. Its mandate would be little more than a dead letter today if it barred only those sanctions—like the execution of children under the age of seven—that civilized society had already repudiated in 1791. See *ante*, at 587 (STEVENS, J., concurring); cf. *Stanford, supra*, at 368 (discussing the common law rule at the time the Bill of Rights was adopted). Rather, because "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man," the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 100–101 (1958) (plurality opinion). In discerning those standards, we look to "objective factors to the maximum possible extent." *Coker, supra*, at 592 (plurality opinion). Laws enacted by the Nation's legislatures provide the "clearest and most reliable objective evidence of contemporary values." *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989).

And data reflecting the actions of sentencing juries, where available, can also afford " 'a significant and reliable objective index' " of societal mores. *Coker, supra,* at 596 (plurality opinion) (quoting *Gregg* v. *Georgia,* 428 U. S. 153, 181 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.)).

Although objective evidence of this nature is entitled to great weight, it does not end our inquiry. Rather, as the Court today reaffirms, see *ante,* at 563, 574–575, "the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment," *Coker, supra,* at 597 (plurality opinion). "[P]roportionality—at least as regards capital punishment—not only requires an inquiry into contemporary standards as expressed by legislators and jurors, but also involves the notion that the magnitude of the punishment imposed must be related to the degree of the harm inflicted on the victim, as well as to the degree of the defendant's blameworthiness." *Enmund, supra,* at 815 (O'CONNOR, J., dissenting). We therefore have a "constitutional obligation" to judge for ourselves whether the death penalty is excessive punishment for a particular offense or class of offenders. See *Stanford,* 492 U. S., at 382 (O'CONNOR, J., concurring in part and concurring in judgment); see also *Enmund, supra,* at 797 ("[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty").

## B

Twice in the last two decades, the Court has applied these principles in deciding whether the Eighth Amendment permits capital punishment of adolescent offenders. In *Thompson* v. *Oklahoma,* 487 U. S. 815 (1988), a plurality of four Justices concluded that the Eighth Amendment barred capital punishment of an offender for a crime committed before the age of 16. I concurred in that judgment on narrower grounds. At the time, 32 state legislatures had "definitely concluded that no 15-year-old should be exposed to the threat

of execution," and no legislature had affirmatively endorsed such a practice. *Id.*, at 849 (O'CONNOR, J., concurring in judgment). While acknowledging that a national consensus forbidding the execution of 15-year-old offenders "very likely" did exist, I declined to adopt that conclusion as a matter of constitutional law without clearer evidentiary support. *Ibid.* Nor, in my view, could the issue be decided based on moral proportionality arguments of the type advanced by the Court today. Granting the premise "that adolescents are generally less blameworthy than adults who commit similar crimes," I wrote, "it does not necessarily follow that all 15-year-olds are incapable of the moral culpability that would justify the imposition of capital punishment." *Id.*, at 853. Similarly, we had before us no evidence "that 15-year-olds as a class are inherently incapable of being deterred from major crimes by the prospect of the death penalty." *Ibid.* I determined instead that, in light of the strong but inconclusive evidence of a national consensus against capital punishment of under-16 offenders, concerns rooted in the Eighth Amendment required that we apply a clear statement rule. Because the capital punishment statute in *Thompson* did not specify the minimum age at which commission of a capital crime would be punishable by death, I concluded that the statute could not be read to authorize the death penalty for a 15-year-old offender. *Id.*, at 857–858.

The next year, in *Stanford* v. *Kentucky, supra,* the Court held that the execution of 16- or 17-year-old capital murderers did not violate the Eighth Amendment. I again wrote separately, concurring in part and concurring in the judgment. At that time, 25 States did not permit the execution of under-18 offenders, including 13 that lacked the death penalty altogether. See *id.*, at 370. While noting that "[t]he day may come when there is such general legislative rejection of the execution of 16- or 17-year-old capital murderers that a clear national consensus can be said to have developed," I concluded that that day had not yet arrived. *Id.*,

at 381–382. I reaffirmed my view that, beyond assessing the actions of legislatures and juries, the Court has a constitutional obligation to judge for itself whether capital punishment is a proportionate response to the defendant's blameworthiness. *Id.*, at 382. Nevertheless, I concluded that proportionality arguments similar to those endorsed by the Court today did not justify a categorical Eighth Amendment rule against capital punishment of 16- and 17-year-old offenders. See *ibid.* (citing *Thompson, supra,* at 853–854 (O'CONNOR, J., concurring in judgment)).

The Court has also twice addressed the constitutionality of capital punishment of mentally retarded offenders. In *Penry* v. *Lynaugh,* 492 U. S. 302 (1989), decided the same year as *Stanford,* we rejected the claim that the Eighth Amendment barred the execution of the mentally retarded. At that time, only two States specifically prohibited the practice, while 14 others did not have capital punishment at all. 492 U. S., at 334. Much had changed when we revisited the question three Terms ago in *Atkins* v. *Virginia,* 536 U. S. 304 (2002). In *Atkins,* the Court reversed *Penry* and held that the Eighth Amendment forbids capital punishment of mentally retarded offenders. 536 U. S., at 321. In the 13 years between *Penry* and *Atkins,* there had been a wave of legislation prohibiting the execution of such offenders. By the time we heard *Atkins,* 30 States barred the death penalty for the mentally retarded, and even among those States theoretically permitting such punishment, very few had executed a mentally retarded offender in recent history. 536 U. S., at 314–316. On the basis of this evidence, the Court determined that it was "fair to say that a national consensus ha[d] developed against" the practice. *Id.,* at 316.

But our decision in *Atkins* did not rest solely on this tentative conclusion. Rather, the Court's independent moral judgment was dispositive. The Court observed that mentally retarded persons suffer from major cognitive and be-

havioral deficits, *i. e.,* "subaverage intellectual functioning" and "significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.,* at 318. "Because of their impairments, [such persons] by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Ibid.* We concluded that these deficits called into serious doubt whether the execution of mentally retarded offenders would measurably contribute to the principal penological goals that capital punishment is intended to serve—retribution and deterrence. *Id.,* at 319–321. Mentally retarded offenders' impairments so diminish their personal moral culpability that it is highly unlikely that such offenders could ever deserve the ultimate punishment, even in cases of capital murder. *Id.,* at 319. And these same impairments made it very improbable that the threat of the death penalty would deter mentally retarded persons from committing capital crimes. *Id.,* at 319–320. Having concluded that capital punishment of the mentally retarded is inconsistent with the Eighth Amendment, the Court "'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.,* at 317 (quoting *Ford* v. *Wainwright,* 477 U. S. 399, 416–417 (1986)).

## II

### A

Although the general principles that guide our Eighth Amendment jurisprudence afford some common ground, I part ways with the Court in applying them to the case before us. As a preliminary matter, I take issue with the Court's failure to reprove, or even to acknowledge, the Supreme Court of Missouri's unabashed refusal to follow our

controlling decision in *Stanford.* The lower court concluded that, despite *Stanford*'s clear holding and historical recency, our decision was no longer binding authority because it was premised on what the court deemed an obsolete assessment of contemporary values. Quite apart from the merits of the constitutional question, this was clear error.

Because the Eighth Amendment "draw[s] its meaning from . . . evolving standards of decency," *Trop,* 356 U. S., at 101 (plurality opinion), significant changes in societal mores over time may require us to reevaluate a prior decision. Nevertheless, it remains *"this* Court's prerogative *alone* to overrule one of its precedents." *State Oil Co.* v. *Khan,* 522 U. S. 3, 20 (1997) (emphasis added). That is so even where subsequent decisions or factual developments may appear to have "significantly undermined" the rationale for our earlier holding. *United States* v. *Hatter,* 532 U. S. 557, 567 (2001); see also *State Oil Co., supra,* at 20; *Rodriguez de Quijas* v. *Shearson/American Express, Inc.,* 490 U. S. 477, 484 (1989). The Eighth Amendment provides no exception to this rule. On the contrary, clear, predictable, and uniform constitutional standards are especially desirable in this sphere. By affirming the lower court's judgment without so much as a slap on the hand, today's decision threatens to invite frequent and disruptive reassessments of our Eighth Amendment precedents.

B

In determining whether the juvenile death penalty comports with contemporary standards of decency, our inquiry begins with the "clearest and most reliable objective evidence of contemporary values"—the actions of the Nation's legislatures. *Penry, supra,* at 331. As the Court emphasizes, the overall number of jurisdictions that currently disallow the execution of under-18 offenders is the same as the number that forbade the execution of mentally retarded offenders when *Atkins* was decided.

*Ante,* at 564. At present, 12 States and the District of Columbia do not have the death penalty, while an additional 18 States and the Federal Government authorize capital punishment but prohibit the execution of under-18 offenders. See *ante,* at 580–581 (Appendix A). And here, as in *Atkins,* only a very small fraction of the States that permit capital punishment of offenders within the relevant class has actually carried out such an execution in recent history: Six States have executed under-18 offenders in the 16 years since *Stanford,* while five States had executed mentally retarded offenders in the 13 years prior to *Atkins.* See *Atkins,* 536 U. S., at 316; V. Streib, The Juvenile Death Penalty Today: Death Sentences and Executions for Juvenile Crimes, January 1, 1973–December 31, 2004, No. 76, pp. 15–23 (2005), available at http://www.law.onu.edu/faculty/streib/documents/JuvDeathDec2004.pdf (last updated Jan. 31, 2005) (as visited Feb. 25, 2005, and available in Clerk of Court's case file) (hereinafter Streib). In these respects, the objective evidence in this case is, indeed, "similar, and in some respects parallel to," the evidence upon which we relied in *Atkins. Ante,* at 564.

While the similarities between the two cases are undeniable, the objective evidence of national consensus is marginally weaker here. Most importantly, in *Atkins* there was significant evidence of *opposition* to the execution of the mentally retarded, but there was virtually no countervailing evidence of affirmative legislative *support* for this practice. Cf. *Thompson,* 487 U. S., at 849 (O'CONNOR, J., concurring in judgment) (attributing significance to the fact that "no legislature in this country has affirmatively and unequivocally endorsed" capital punishment of 15-year-old offenders). The States that permitted such executions did so only because they had not enacted any prohibitory legislation. Here, by contrast, at least seven States have current statutes that specifically set 16 or 17 as the minimum age at which

commission of a capital crime can expose the offender to the death penalty. See *ante*, at 579–580 (Appendix A).* Five of these seven States presently have one or more juvenile offenders on death row (six if respondent is included in the count), see Streib 24–31, and four of them have executed at least one under-18 offender in the past 15 years, see *id.*, at 15–23. In all, there are currently over 70 juvenile offenders on death row in 12 different States (13 including respondent). See *id.*, at 11, 24–31. This evidence suggests some measure of continuing public support for the availability of the death penalty for 17-year-old capital murderers.

Moreover, the Court in *Atkins* made clear that it was "not so much the number of [States forbidding execution of the mentally retarded] that [was] significant, but the consistency of the direction of change." 536 U. S., at 315. In contrast to the trend in *Atkins*, the States have not moved uniformly toward abolishing the juvenile death penalty. Instead, since our decision in *Stanford*, two States have expressly reaffirmed their support for this practice by enacting statutes setting 16 as the minimum age for capital punishment. See Mo. Rev. Stat. § 565.020.2 (2000); Va. Code Ann. § 18.2–10(a) (Lexis 2004). Furthermore, as the Court emphasized in *Atkins* itself, 536 U. S., at 315, n. 18, the pace of legislative action in this context has been considerably slower than it was with regard to capital punishment of the mentally re-

---

*In 12 other States that have capital punishment, under-18 offenders can be subject to the death penalty as a result of transfer statutes that permit such offenders to be tried as adults for certain serious crimes. See *ante*, at 579–580 (Appendix A). As I observed in *Thompson* v. *Oklahoma*, 487 U. S. 815, 850–852 (1988) (opinion concurring in judgment): "There are many reasons, having nothing whatsoever to do with capital punishment, that might motivate a legislature to provide as a general matter for some [minors] to be channeled into the adult criminal justice process." Accordingly, while these 12 States clearly cannot be counted as *opposing* capital punishment of under-18 offenders, the fact that they permit such punishment through this indirect mechanism does not necessarily show affirmative and unequivocal legislative support for the practice. See *ibid.*

tarded. In the 13 years between our decisions in *Penry* and *Atkins*, no fewer than 16 States banned the execution of mentally retarded offenders. See *Atkins, supra,* at 314–315. By comparison, since our decision 16 years ago in *Stanford*, only four States that previously permitted the execution of under-18 offenders, plus the Federal Government, have legislatively reversed course, and one additional State's high court has construed the State's death penalty statute not to apply to under-18 offenders, see *State* v. *Furman,* 122 Wash. 2d 440, 458, 858 P. 2d 1092, 1103 (1993) (en banc). The slower pace of change is no doubt partially attributable, as the Court says, to the fact that 12 States had already imposed a minimum age of 18 when *Stanford* was decided. See *ante,* at 566–567. Nevertheless, the extraordinary wave of legislative action leading up to our decision in *Atkins* provided strong evidence that the country truly had set itself against capital punishment of the mentally retarded. Here, by contrast, the halting pace of change gives reason for pause.

To the extent that the objective evidence supporting today's decision is similar to that in *Atkins*, this merely highlights the fact that such evidence is not dispositive in either of the two cases. After all, as the Court today confirms, *ante,* at 563, 574–575, the Constitution requires that " 'in the end our own judgment . . . be brought to bear' " in deciding whether the Eighth Amendment forbids a particular punishment, *Atkins, supra,* at 312 (quoting *Coker,* 433 U. S., at 597 (plurality opinion)). This judgment is not merely a rubber stamp on the tally of legislative and jury actions. Rather, it is an integral part of the Eighth Amendment inquiry—and one that is entitled to independent weight in reaching our ultimate decision.

Here, as in *Atkins*, the objective evidence of a national consensus is weaker than in most prior cases in which the Court has struck down a particular punishment under the Eighth Amendment. See *Coker, supra,* at 595–596 (plurality opinion) (striking down death penalty for rape of an adult

woman, where only one jurisdiction authorized such punishment); *Enmund*, 458 U. S., at 792 (striking down death penalty for certain crimes of aiding and abetting felony-murder, where only eight jurisdictions authorized such punishment); *Ford* v. *Wainwright*, 477 U. S., at 408 (striking down capital punishment of the insane, where no jurisdiction permitted this practice). In my view, the objective evidence of national consensus, standing alone, was insufficient to dictate the Court's holding in *Atkins*. Rather, the compelling moral proportionality argument against capital punishment of mentally retarded offenders played a *decisive* role in persuading the Court that the practice was inconsistent with the Eighth Amendment. Indeed, the force of the proportionality argument in *Atkins* significantly bolstered the Court's confidence that the objective evidence in that case did, in fact, herald the emergence of a genuine national consensus. Here, by contrast, the proportionality argument against the juvenile death penalty is so flawed that it can be given little, if any, analytical weight—it proves too weak to resolve the lingering ambiguities in the objective evidence of legislative consensus or to justify the Court's categorical rule.

## C

Seventeen-year-old murderers must be categorically exempted from capital punishment, the Court says, because they "cannot with reliability be classified among the worst offenders." *Ante*, at 569. That conclusion is premised on three perceived differences between "adults," who have already reached their 18th birthdays, and "juveniles," who have not. See *ante*, at 569–570. First, juveniles lack maturity and responsibility and are more reckless than adults. Second, juveniles are more vulnerable to outside influences because they have less control over their surroundings. And third, a juvenile's character is not as fully formed as that of an adult. Based on these characteristics, the Court determines that 17-year-old capital murderers are not as

blameworthy as adults guilty of similar crimes; that 17-year-olds are less likely than adults to be deterred by the prospect of a death sentence; and that it is difficult to conclude that a 17-year-old who commits even the most heinous of crimes is "irretrievably depraved." *Ante,* at 570–572. The Court suggests that "a rare case might arise in which a juvenile offender has sufficient psychological maturity, and at the same time demonstrates sufficient depravity, to merit a sentence of death." *Ante,* at 572. However, the Court argues that a categorical age-based prohibition is justified as a prophylactic rule because "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Ante,* at 572–573.

It is beyond cavil that juveniles as a class are generally less mature, less responsible, and less fully formed than adults, and that these differences bear on juveniles' comparative moral culpability. See, *e. g., Johnson* v. *Texas,* 509 U. S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance"); *id.,* at 376 (O'CONNOR, J., dissenting) ("[T]he vicissitudes of youth bear directly on the young offender's culpability and responsibility for the crime"); *Eddings,* 455 U. S., at 115–116 ("Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults"). But even accepting this premise, the Court's proportionality argument fails to support its categorical rule.

First, the Court adduces no evidence whatsoever in support of its sweeping conclusion, see *ante,* at 572, that it is only in "rare" cases, if ever, that 17-year-old murderers are sufficiently mature and act with sufficient depravity to warrant the death penalty. The fact that juveniles are generally *less* culpable for their misconduct than adults does not necessarily mean that a 17-year-old murderer cannot be *sufficiently* culpable to merit the death penalty. At most, the

Court's argument suggests that the average 17-year-old murderer is not as culpable as the average adult murderer. But an especially depraved juvenile offender may nevertheless be just as culpable as many adult offenders considered bad enough to deserve the death penalty. Similarly, the fact that the availability of the death penalty may be *less* likely to deter a juvenile from committing a capital crime does not imply that this threat cannot *effectively* deter some 17-year-olds from such an act. Surely there is an age below which no offender, no matter what his crime, can be deemed to have the cognitive or emotional maturity necessary to warrant the death penalty. But at least at the margins between adolescence and adulthood—and especially for 17-year-olds such as respondent—the relevant differences between "adults" and "juveniles" appear to be a matter of degree, rather than of kind. It follows that a legislature may reasonably conclude that at least *some* 17-year-olds can act with sufficient moral culpability, and can be sufficiently deterred by the threat of execution, that capital punishment may be warranted in an appropriate case.

Indeed, this appears to be just such a case. Christopher Simmons' murder of Shirley Crook was premeditated, wanton, and cruel in the extreme. Well before he committed this crime, Simmons declared that he wanted to kill someone. On several occasions, he discussed with two friends (ages 15 and 16) his plan to burglarize a house and to murder the victim by tying the victim up and pushing him from a bridge. Simmons said they could " 'get away with it' " because they were minors. Brief for Petitioner 3. In accord with this plan, Simmons and his 15-year-old accomplice broke into Mrs. Crook's home in the middle of the night, forced her from her bed, bound her, and drove her to a state park. There, they walked her to a railroad trestle spanning a river, "hog-tied" her with electrical cable, bound her face completely with duct tape, and pushed her, still alive, from the trestle. She drowned in the water below. *Id.*, at 4. One can

scarcely imagine the terror that this woman must have suffered throughout the ordeal leading to her death. Whatever can be said about the comparative moral culpability of 17-year-olds as a general matter, Simmons' actions unquestionably reflect "'a consciousness materially more "depraved" than that of' . . . the average murderer."' *Atkins*, 536 U. S., at 319 (quoting *Godfrey* v. *Georgia*, 446 U. S. 420, 433 (1980)). And Simmons' prediction that he could murder with impunity because he had not yet turned 18—though inaccurate—suggests that he *did* take into account the perceived risk of punishment in deciding whether to commit the crime. Based on this evidence, the sentencing jury certainly had reasonable grounds for concluding that, despite Simmons' youth, he "ha[d] sufficient psychological maturity" when he committed this horrific murder, and "at the same time demonstrate[d] sufficient depravity, to merit a sentence of death." *Ante*, at 572.

The Court's proportionality argument suffers from a second and closely related defect: It fails to establish that the differences in maturity between 17-year-olds and young "adults" are both universal enough and significant enough to justify a bright-line prophylactic rule against capital punishment of the former. The Court's analysis is premised on differences *in the aggregate* between juveniles and adults, which frequently do not hold true when comparing individuals. Although it may be that many 17-year-old murderers lack sufficient maturity to deserve the death penalty, some juvenile murderers may be quite mature. Chronological age is not an unfailing measure of psychological development, and common experience suggests that many 17-year-olds are more mature than the average young "adult." In short, the class of offenders exempted from capital punishment by today's decision is too broad and too diverse to warrant a categorical prohibition. Indeed, the age-based line drawn by the Court is indefensibly arbitrary—it quite likely will protect a number of offenders who are mature enough to

deserve the death penalty and may well leave vulnerable many who are not.

For purposes of proportionality analysis, 17-year-olds as a class are qualitatively and materially different from the mentally retarded. "Mentally retarded" offenders, as we understood that category in *Atkins*, are *defined* by precisely the characteristics which render death an excessive punishment. A mentally retarded person is, "by definition," one whose cognitive and behavioral capacities have been proved to fall below a certain minimum. See *Atkins*, 536 U. S., at 318; see also *id.*, at 308, n. 3 (discussing characteristics of mental retardation); *id.*, at 317, and n. 22 (leaving to the States the development of mechanisms to determine which offenders fall within the class exempt from capital punishment). Accordingly, for purposes of our decision in *Atkins*, the mentally retarded are not merely *less* blameworthy for their misconduct or *less* likely to be deterred by the death penalty than others. Rather, a mentally retarded offender is one whose demonstrated impairments make it so highly unlikely that he is culpable enough to deserve the death penalty or that he could have been deterred by the threat of death, that execution is not a defensible punishment. There is no such inherent or accurate fit between an offender's chronological age and the personal limitations which the Court believes make capital punishment excessive for 17-year-old murderers. Moreover, it defies common sense to suggest that 17-year-olds as a class are somehow equivalent to mentally retarded persons with regard to culpability or susceptibility to deterrence. Seventeen-year-olds may, on average, be less mature than adults, but that lesser maturity simply cannot be equated with the major, lifelong impairments suffered by the mentally retarded.

The proportionality issues raised by the Court clearly implicate Eighth Amendment concerns. But these concerns may properly be addressed not by means of an arbitrary, categorical age-based rule, but rather through individualized

sentencing in which juries are required to give appropriate mitigating weight to the defendant's immaturity, his susceptibility to outside pressures, his cognizance of the consequences of his actions, and so forth. In that way the constitutional response can be tailored to the specific problem it is meant to remedy. The Eighth Amendment guards against the execution of those who are "insufficient[ly] culpab[le]," see *ante*, at 573, in significant part, by requiring sentencing that "reflect[s] a reasoned *moral* response to the defendant's background, character, and crime." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring). Accordingly, the sentencer in a capital case must be permitted to give full effect to all constitutionally relevant mitigating evidence. See *Tennard* v. *Dretke*, 542 U. S. 274, 283–285 (2004); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion). A defendant's youth or immaturity is, of course, a paradigmatic example of such evidence. See *Eddings*, 455 U. S., at 115–116.

Although the prosecutor's apparent attempt to use respondent's youth as an aggravating circumstance in this case is troubling, that conduct was never challenged with specificity in the lower courts and is not directly at issue here. As the Court itself suggests, such "overreaching" would best be addressed, if at all, through a more narrowly tailored remedy. See *ante*, at 573. The Court argues that sentencing juries cannot accurately evaluate a youthful offender's maturity or give appropriate weight to the mitigating characteristics related to youth. But, again, the Court presents no real evidence—and the record appears to contain none—supporting this claim. Perhaps more importantly, the Court fails to explain why this duty should be so different from, or so much more difficult than, that of assessing and giving proper effect to any other qualitative capital sentencing factor. I would not be so quick to conclude that the constitutional safeguards, the sentencing juries, and the trial judges upon

which we place so much reliance in all capital cases are inadequate in this narrow context.

### D

I turn, finally, to the Court's discussion of foreign and international law. Without question, there has been a global trend in recent years toward abolishing capital punishment for under-18 offenders. Very few, if any, countries other than the United States now permit this practice in law or in fact. See *ante,* at 576–577. While acknowledging that the actions and views of other countries do not dictate the outcome of our Eighth Amendment inquiry, the Court asserts that "the overwhelming weight of international opinion against the juvenile death penalty . . . does provide respected and significant confirmation for [its] own conclusions." *Ante,* at 578. Because I do not believe that a genuine *national* consensus against the juvenile death penalty has yet developed, and because I do not believe the Court's moral proportionality argument justifies a categorical, age-based constitutional rule, I can assign no such *confirmatory* role to the international consensus described by the Court. In short, the evidence of an international consensus does not alter my determination that the Eighth Amendment does not, at this time, forbid capital punishment of 17-year-old murderers in all cases.

Nevertheless, I disagree with JUSTICE SCALIA's contention, *post,* at 622–628 (dissenting opinion), that foreign and international law have no place in our Eighth Amendment jurisprudence. Over the course of nearly half a century, the Court has consistently referred to foreign and international law as relevant to its assessment of evolving standards of decency. See *Atkins, supra,* at 317, n. 21; *Thompson,* 487 U. S., at 830–831, and n. 31 (plurality opinion); *Enmund,* 458 U. S., at 796–797, n. 22; *Coker,* 433 U. S., at 596, n. 10 (plurality opinion); *Trop,* 356 U. S., at 102–103 (plurality opinion). This inquiry reflects the special character of the Eighth

Amendment, which, as the Court has long held, draws its meaning directly from the maturing values of civilized society. Obviously, American law is distinctive in many respects, not least where the specific provisions of our Constitution and the history of its exposition so dictate. Cf. *post*, at 624–625 (SCALIA, J., dissenting) (discussing distinctively American rules of law related to the Fourth Amendment and the Establishment Clause). But this Nation's evolving understanding of human dignity certainly is neither wholly isolated from, nor inherently at odds with, the values prevailing in other countries. On the contrary, we should not be surprised to find congruence between domestic and international values, especially where the international community has reached clear agreement—expressed in international law or in the domestic laws of individual countries—that a particular form of punishment is inconsistent with fundamental human rights. At least, the existence of an international consensus of this nature can serve to confirm the reasonableness of a consonant and genuine American consensus. The instant case presents no such domestic consensus, however, and the recent emergence of an otherwise global consensus does not alter that basic fact.

\* \* \*

In determining whether the Eighth Amendment permits capital punishment of a particular offense or class of offenders, we must look to whether such punishment is consistent with contemporary standards of decency. We are obligated to weigh both the objective evidence of societal values and our own judgment as to whether death is an excessive sanction in the context at hand. In the instant case, the objective evidence is inconclusive; standing alone, it does not demonstrate that our society has repudiated capital punishment of 17-year-old offenders in all cases. Rather, the actions of the Nation's legislatures suggest that, although a clear and durable national consensus against this practice may in time

emerge, that day has yet to arrive. By acting so soon after our decision in *Stanford*, the Court both pre-empts the democratic debate through which genuine consensus might develop and simultaneously runs a considerable risk of inviting lower court reassessments of our Eighth Amendment precedents.

To be sure, the objective evidence supporting today's decision is similar to (though marginally weaker than) the evidence before the Court in *Atkins*. But *Atkins* could not have been decided as it was based solely on such evidence. Rather, the compelling proportionality argument against capital punishment of the mentally retarded played a decisive role in the Court's Eighth Amendment ruling. Moreover, the constitutional rule adopted in *Atkins* was tailored to this proportionality argument: It exempted from capital punishment a defined group of offenders whose proven impairments rendered it highly unlikely, and perhaps impossible, that they could act with the degree of culpability necessary to deserve death. And *Atkins* left to the States the development of mechanisms to determine which individual offenders fell within this class.

In the instant case, by contrast, the moral proportionality arguments against the juvenile death penalty fail to support the rule the Court adopts today. There is no question that "the chronological age of a minor is itself a relevant mitigating factor of great weight," *Eddings*, 455 U. S., at 116, and that sentencing juries must be given an opportunity carefully to consider a defendant's age and maturity in deciding whether to assess the death penalty. But the mitigating characteristics associated with youth do not justify an absolute age limit. A legislature can reasonably conclude, as many have, that some 17-year-old murderers are mature enough to deserve the death penalty in an appropriate case. And nothing in the record before us suggests that sentencing juries are so unable accurately to assess a 17-year-old de-

fendant's maturity, or so incapable of giving proper weight to youth as a mitigating factor, that the Eighth Amendment requires the bright-line rule imposed today. In the end, the Court's flawed proportionality argument simply cannot bear the weight the Court would place upon it.

Reasonable minds can differ as to the minimum age at which commission of a serious crime should expose the defendant to the death penalty, if at all. Many jurisdictions have abolished capital punishment altogether, while many others have determined that even the most heinous crime, if committed before the age of 18, should not be punishable by death. Indeed, were my office that of a legislator, rather than a judge, then I, too, would be inclined to support legislation setting a minimum age of 18 in this context. But a significant number of States, including Missouri, have decided to make the death penalty potentially available for 17-year-old capital murderers such as respondent. Without a clearer showing that a genuine national consensus forbids the execution of such offenders, this Court should not substitute its own "inevitably subjective judgment" on how best to resolve this difficult moral question for the judgments of the Nation's democratically elected legislatures. See *Thompson*, 487 U. S., at 854 (O'CONNOR, J., concurring in judgment). I respectfully dissent.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

In urging approval of a constitution that gave life-tenured judges the power to nullify laws enacted by the people's representatives, Alexander Hamilton assured the citizens of New York that there was little risk in this, since "[t]he judiciary . . . ha[s] neither FORCE nor WILL but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961). But Hamilton had in mind a traditional judiciary, "bound down by strict rules and precedents which serve to define

and point out their duty in every particular case that comes before them." *Id.*, at 471. Bound down, indeed. What a mockery today's opinion makes of Hamilton's expectation, announcing the Court's conclusion that the meaning of our Constitution has changed over the past 15 years—not, mind you, that this Court's decision 15 years ago was *wrong*, but that the Constitution *has changed.* The Court reaches this implausible result by purporting to advert, not to the original meaning of the Eighth Amendment, but to "the evolving standards of decency," *ante*, at 561 (internal quotation marks omitted), of our national society. It then finds, on the flimsiest of grounds, that a national consensus which could not be perceived in our people's laws barely 15 years ago now solidly exists. Worse still, the Court says in so many words that what our people's laws say about the issue does not, in the last analysis, matter: "[I]n the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Ante,* at 563 (internal quotation marks omitted). The Court thus proclaims itself sole arbiter of our Nation's moral standards—and in the course of discharging that awesome responsibility purports to take guidance from the views of foreign courts and legislatures. Because I do not believe that the meaning of our Eighth Amendment, any more than the meaning of other provisions of our Constitution, should be determined by the subjective views of five Members of this Court and like-minded foreigners, I dissent.

I

In determining that capital punishment of offenders who committed murder before age 18 is "cruel and unusual" under the Eighth Amendment, the Court first considers, in accordance with our modern (though in my view mistaken) jurisprudence, whether there is a "national consensus," *ibid.* (internal quotation marks omitted), that laws allowing such

executions contravene our modern "standards of decency,"[1] *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958). . We have held that this determination should be based on "objective indicia that reflect the public attitude toward a given sanction"—namely, "statutes passed by society's elected representatives." *Stanford* v. *Kentucky*, 492 U. S. 361, 370 (1989) (internal quotation marks omitted). As in *Atkins* v. *Virginia*, 536 U. S. 304, 312 (2002), the Court dutifully recites this test and claims halfheartedly that a national consensus has emerged since our decision in *Stanford*, because 18 States—or 47% of States that permit capital punishment—now have legislation prohibiting the execution of offenders under 18, and because all of 4 States have adopted such legislation since *Stanford*. See *ante*, at 565.

Words have no meaning if the views of less than 50% of death penalty States can constitute a national consensus. See *Atkins, supra*, at 342–345 (SCALIA, J., dissenting). Our previous cases have required overwhelming opposition to a challenged practice, generally over a long period of time. In *Coker* v. *Georgia*, 433 U. S. 584, 595–596 (1977), a plurality concluded the Eighth Amendment prohibited capital punishment for rape of an adult woman where only one jurisdiction authorized such punishment. The plurality also observed that "[a]t no time in the last 50 years ha[d] a majority of

---

[1] The Court ignores entirely the threshold inquiry in determining whether a particular punishment complies with the Eighth Amendment: whether it is one of the "modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted." *Ford* v. *Wainwright*, 477 U. S. 399, 405 (1986). As we have noted in prior cases, the evidence is unusually clear that the Eighth Amendment was not originally understood to prohibit capital punishment for 16- and 17-year-old offenders. See *Stanford* v. *Kentucky*, 492 U. S. 361, 368 (1989). At the time the Eighth Amendment was adopted, the death penalty could theoretically be imposed for the crime of a 7-year-old, though there was a rebuttable presumption of incapacity to commit a capital (or other) felony until the age of 14. See *ibid.* (citing 4 W. Blackstone, Commentaries *23–*24; 1 M. Hale, Pleas of the Crown 24–29 (1800)).

States authorized death as a punishment for rape." *Id.*, at 593. In *Ford* v. *Wainwright,* 477 U. S. 399, 408 (1986), we held execution of the insane unconstitutional, tracing the roots of this prohibition to the common law and noting that "no State in the union permits the execution of the insane." In *Enmund* v. *Florida,* 458 U. S. 782, 792 (1982), we invalidated capital punishment imposed for participation in a robbery in which an accomplice committed murder, because 78% of all death penalty States prohibited this punishment. Even there we expressed some hesitation, because the legislative judgment was "neither 'wholly unanimous among state legislatures,' . . . nor as compelling as the legislative judgments considered in *Coker.*" *Id.*, at 793. By contrast, agreement among 42% of death penalty States in *Stanford,* which the Court appears to believe was correctly decided at the time, *ante,* at 574, was insufficient to show a national consensus. See *Stanford, supra,* at 372.

In an attempt to keep afloat its implausible assertion of national consensus, the Court throws overboard a proposition well established in our Eighth Amendment jurisprudence. "It should be observed," the Court says, "that the *Stanford* Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty . . . ; a State's decision to bar the death penalty altogether of necessity demonstrates a judgment that the death penalty is inappropriate for all offenders, including juveniles." *Ante,* at 574. The insinuation that the Court's new method of counting contradicts only "the *Stanford* Court" is misleading. *None* of our cases dealing with an alleged constitutional limitation upon the death penalty has counted, as States supporting a consensus in favor of that limitation, States that have eliminated the death penalty entirely. See *Ford, supra,* at 408, n. 2; *Enmund, supra,* at 789; *Coker, supra,* at 594. And with good reason. Consulting States that bar the death penalty concerning the necessity of making an exception to the pen-

alty for offenders under 18 is rather like including old-order Amishmen in a consumer-preference poll on the electric car. Of *course* they don't like it, but that sheds no light whatever on the point at issue. That 12 States favor *no* executions says something about consensus against the death penalty, but nothing—absolutely nothing—about consensus that offenders under 18 deserve special immunity from such a penalty. In repealing the death penalty, those 12 States considered *none* of the factors that the Court puts forth as determinative of the issue before us today—lower culpability of the young, inherent recklessness, lack of capacity for considered judgment, etc. What might be relevant, perhaps, is how many of those States permit 16- and 17-year-old offenders to be treated as adults with respect to noncapital offenses. (They all do;[2] indeed, some even *require* that juveniles as young as 14 be tried as adults if they are charged with murder.[3]) The attempt by the Court to turn its remarkable minority consensus into a faux majority by counting Amishmen is an act of nomological desperation.

Recognizing that its national-consensus argument was weak compared with our earlier cases, the *Atkins* Court found additional support in the fact that 16 States had prohibited execution of mentally retarded individuals since

---

[2] See Alaska Stat. § 47.12.030 (Lexis 2002); Haw. Rev. Stat. § 571–22 (1999); Iowa Code § 232.45 (2003); Me. Rev. Stat. Ann., Tit. 15, § 3101(4) (West 2003); Mass. Gen. Laws Ann., ch. 119, § 74 (West 2003); Mich. Comp. Laws Ann. § 764.27 (West 2000); Minn. Stat. § 260B.125 (2004); N. D. Cent. Code § 27–20–34 (Lexis Supp. 2003); R. I. Gen. Laws § 14–1–7 (Lexis 2002); Vt. Stat. Ann., Tit. 33, § 5516 (Lexis 2001); W. Va. Code § 49–5–10 (Lexis 2004); Wis. Stat. § 938.18 (2003–2004); see also National Center for Juvenile Justice, Trying and Sentencing Juveniles as Adults: An Analysis of State Transfer and Blended Sentencing Laws 1 (Oct. 2003). The District of Columbia is the only jurisdiction without a death penalty that specifically exempts under-18 offenders from its harshest sanction—life imprisonment without parole. See D. C. Code § 22–2104 (West 2001).

[3] See Mass. Gen. Laws Ann., ch. 119, § 74 (West 2003); N. D. Cent. Code § 27–20–34 (Lexis Supp. 2003); W. Va. Code § 49–5–10 (Lexis 2004).

*Penry* v. *Lynaugh,* 492 U. S. 302 (1989). *Atkins,* 536 U. S., at 314–316. Indeed, the *Atkins* Court distinguished *Stanford* on that very ground, explaining that "[a]lthough we decided *Stanford* on the same day as *Penry,* apparently *only two* state legislatures have raised the threshold age for imposition of the death penalty." 536 U. S., at 315, n. 18 (emphasis added). Now, the Court says a legislative change in four States is "significant" enough to trigger a constitutional prohibition.[4] *Ante,* at 566. It is amazing to think that this subtle shift in numbers can take the issue entirely off the table for legislative debate.

I also doubt whether many of the legislators who voted to change the laws in those four States would have done so if they had known their decision would (by the pronouncement of this Court) be rendered irreversible. After all, legislative support for capital punishment, in any form, has surged and ebbed throughout our Nation's history. As JUSTICE O'CONNOR has explained:

"The history of the death penalty instructs that there is danger in inferring a settled societal consensus from statistics like those relied on in this case. In 1846, Michigan became the first State to abolish the death penalty .... In succeeding decades, other American States continued the trend towards abolition .... Later, and particularly after World War II, there ensued a steady and dramatic decline in executions .... In the 1950's and 1960's, more States abolished or radically restricted capital punishment, and executions ceased completely for several years beginning in 1968. ...

---

[4] As the Court notes, Washington State's decision to prohibit executions of offenders under 18 was made by a judicial, not legislative, decision. *State* v. *Furman,* 122 Wash. 2d 440, 459, 858 P. 2d 1092, 1103 (1993), construed the State's death penalty statute—which did not set any age limit—to apply only to persons over 18. The opinion found that construction necessary to avoid what it considered constitutional difficulties, and did not purport to reflect popular sentiment. It is irrelevant to the question of changed national consensus.

"In 1972, when this Court heard arguments on the constitutionality of the death penalty, such statistics might have suggested that the practice had become a relic, implicitly rejected by a new societal consensus. . . . We now know that any inference of a societal consensus rejecting the death penalty would have been mistaken. But had this Court then declared the existence of such a consensus, and outlawed capital punishment, legislatures would very likely not have been able to revive it. The mistaken premise of the decision would have been frozen into constitutional law, making it difficult to refute and even more difficult to reject." *Thompson* v. *Oklahoma,* 487 U. S. 815, 854–855 (1988) (opinion concurring in judgment).

Relying on such narrow margins is especially inappropriate in light of the fact that a number of legislatures and voters have expressly affirmed their support for capital punishment of 16- and 17-year-old offenders since *Stanford.* Though the Court is correct that no State has lowered its death penalty age, both the Missouri and Virginia Legislatures—which, at the time of *Stanford,* had no minimum age requirement—expressly established 16 as the minimum. Mo. Rev. Stat. § 565.020.2 (2000); Va. Code Ann. § 18.2–10(a) (Lexis 2004). The people of Arizona[5] and Florida[6] have

---

[5] In 1996, Arizona's Ballot Proposition 102 exposed under-18 murderers to the death penalty by automatically transferring them out of juvenile courts. The statute implementing the proposition required the county attorney to "bring a criminal prosecution against a juvenile in the same manner as an adult if the juvenile is fifteen, sixteen or seventeen years of age and is accused of . . . first degree murder." Ariz. Rev. Stat. Ann. § 13–501 (West 2001). The Arizona Supreme Court has added to this scheme a constitutional requirement that there be an individualized assessment of the juvenile's maturity at the time of the offense. See *State* v. *Davolt,* 207 Ariz. 191, 214–216, 84 P. 3d 456, 479–481 (2004).

[6] Florida voters approved an amendment to the State Constitution, which changed the wording from "cruel *or* unusual" to "cruel *and* unusual," Fla. Const., Art. I, § 17 (2003). See Commentary to 1998 Amendment, 25B Fla. Stat. Ann., p. 180 (West 2004). This was a response to a

done the same by ballot initiative. Thus, even States that have not executed an under-18 offender in recent years unquestionably favor the possibility of capital punishment in some circumstances.

The Court's reliance on the infrequency of executions for under-18 murderers, *ante*, at 564–565, 567, credits an argument that this Court considered and explicitly rejected in *Stanford*. That infrequency is explained, we accurately said, both by "the undisputed fact that a far smaller percentage of capital crimes are committed by persons under 18 than over 18," 492 U. S., at 374, and by the fact that juries are required at sentencing to consider the offender's youth as a mitigating factor, see *Eddings* v. *Oklahoma*, 455 U. S. 104, 115–116 (1982). Thus, "it is not only possible, but overwhelmingly probable, that the very considerations which induce [respondent] and [his] supporters to believe that death should *never* be imposed on offenders under 18 cause prosecutors and juries to believe that it should *rarely* be imposed." *Stanford, supra,* at 374.

It is, furthermore, unclear that executions of the relevant age group have decreased since we decided *Stanford*. Between 1990 and 2003, 123 of 3,599 death sentences, or 3.4%, were given to individuals who committed crimes before reaching age 18. V. Streib, The Juvenile Death Penalty Today: Death Sentences and Executions for Juvenile Crimes, January 1, 1973–September 30, 2004, No. 75, p. 9 (Table 3) (last updated Oct. 5, 2004), http://www.law.onu.edu/faculty/streib/documents/JuvDeathSept302004.pdf (all Internet materials as visited Jan. 12, 2005, and available in Clerk of Court's case file) (hereinafter Juvenile Death Penalty Today).

---

Florida Supreme Court ruling that "cruel *or* unusual" excluded the death penalty for a defendant who committed murder when he was younger than 17. See *Brennan* v. *State*, 754 So. 2d 1, 5 (1999). By adopting the federal constitutional language, Florida voters effectively adopted our decision in *Stanford* v. *Kentucky*, 492 U. S. 361 (1989). See Weaver, Word May Allow Execution of 16-Year-Olds, Miami Herald, Nov. 7, 2002, p. 7B.

By contrast, only 2.1% of those sentenced to death between 1982 and 1988 committed the crimes when they were under 18. See *Stanford, supra*, at 373 (citing V. Streib, Imposition of Death Sentences for Juvenile Offenses, January 1, 1982, Through April 1, 1989, p. 2 (paper for Cleveland-Marshall College of Law, April 5, 1989)). As for actual executions of under-18 offenders, they constituted 2.4% of the total executions since 1973. Juvenile Death Penalty Today 4. In *Stanford*, we noted that only 2% of the executions between 1642 and 1986 were of under-18 offenders and found that that lower number did not demonstrate a national consensus against the penalty. 492 U. S., at 373–374 (citing V. Streib, Death Penalty for Juveniles 55, 57 (1987)). Thus, the numbers of under-18 offenders subjected to the death penalty, though low compared with adults, have either held steady or slightly increased since *Stanford*. These statistics in no way support the action the Court takes today.

## II

Of course, the real force driving today's decision is not the actions of four state legislatures, but the Court's "'"own judgment"'" that murderers younger than 18 can never be as morally culpable as older counterparts. *Ante*, at 563 (quoting *Atkins*, 536 U. S., at 312 (in turn quoting *Coker*, 433 U. S., at 597 (plurality opinion))). The Court claims that this usurpation of the role of moral arbiter is simply a "retur[n] to the rul[e] established in decisions predating *Stanford*," *ante*, at 563. That supposed rule—which is reflected solely in dicta and never once in a *holding* that purports to supplant the consensus of the American people with the Justices' views[7]—was repudiated in *Stanford* for the very good rea-

---

[7] See, *e. g., Enmund* v. *Florida*, 458 U. S. 782, 801 (1982) ("[W]e have no reason to disagree with th[e] judgment [of the state legislatures] for purposes of construing and applying the Eighth Amendment"); *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion) ("[T]he legislative rejection of capital punishment for rape strongly confirms our own judgment").

son that it has no foundation in law or logic. If the Eighth Amendment set forth an ordinary rule of law, it would indeed be the role of this Court to say what the law is. But the Court having pronounced that the Eighth Amendment is an ever-changing reflection of "the evolving standards of decency" of our society, it makes no sense for the Justices then to *prescribe* those standards rather than discern them from the practices of our people. On the evolving-standards hypothesis, the only legitimate function of this Court is to identify a moral consensus of the American people. By what conceivable warrant can nine lawyers presume to be the authoritative conscience of the Nation? [8]

The reason for insistence on legislative primacy is obvious and fundamental: " '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' " *Gregg* v. *Georgia,* 428 U. S. 153, 175–176 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (quoting *Furman* v. *Georgia,* 408 U. S. 238, 383 (1972) (Burger, C. J., dissenting)). For a similar reason we have, in our determination of society's moral standards, consulted the practices of sentencing juries: Juries " 'maintain a link between contemporary community values and the penal system' " that this Court cannot claim for itself. *Gregg, supra,* at 181 (quoting *Witherspoon* v. *Illinois,* 391 U. S. 510, 519, n. 15 (1968)).

Today's opinion provides a perfect example of why judges are ill equipped to make the type of legislative judgments the Court insists on making here. To support its opinion that States should be prohibited from imposing the death

---

[8] JUSTICE O'CONNOR agrees with our analysis that no national consensus exists here, *ante,* at 594–598 (dissenting opinion). She is nonetheless prepared (like the majority) to override the judgment of America's legislatures if it contradicts her own assessment of "moral proportionality," *ante,* at 598. She dissents here only because it does not. The votes in today's case demonstrate that the offending of selected lawyers' moral sentiments is not a predictable basis for law—much less a democratic one.

penalty on anyone who committed murder before age 18, the Court looks to scientific and sociological studies, picking and choosing those that support its position. It never explains why those particular studies are methodologically sound; none was ever entered into evidence or tested in an adversarial proceeding. As THE CHIEF JUSTICE has explained:

> "[M]ethodological and other errors can affect the reliability and validity of estimates about the opinions and attitudes of a population derived from various sampling techniques. Everything from variations in the survey methodology, such as the choice of the target population, the sampling design used, the questions asked, and the statistical analyses used to interpret the data can skew the results." *Atkins, supra,* at 326–327 (dissenting opinion) (citing R. Groves, Survey Errors and Survey Costs (1989); 1 C. Turner & E. Martin, Surveying Subjective Phenomena (1984)).

In other words, all the Court has done today, to borrow from another context, is to look over the heads of the crowd and pick out its friends. Cf. *Conroy* v. *Aniskoff,* 507 U. S. 511, 519 (1993) (SCALIA, J., concurring in judgment).

We need not look far to find studies contradicting the Court's conclusions. As petitioner points out, the American Psychological Association (APA), which claims in this case that scientific evidence shows persons under 18 lack the ability to take moral responsibility for their decisions, has previously taken precisely the opposite position before this very Court. In its brief in *Hodgson* v. *Minnesota,* 497 U. S. 417 (1990), the APA found a "rich body of research" showing that juveniles are mature enough to decide whether to obtain an abortion without parental involvement. Brief for APA as *Amicus Curiae,* O. T. 1989, No. 88–805 etc., p. 18. The APA brief, citing psychology treatises and studies too numerous to list here, asserted: "[B]y middle adolescence (age 14–15) young people develop abilities similar to adults in reasoning

about moral dilemmas, understanding social rules and laws, [and] reasoning about interpersonal relationships and interpersonal problems." *Id.*, at 19–20 (citations omitted). Given the nuances of scientific methodology and conflicting views, courts—which can only consider the limited evidence on the record before them—are ill equipped to determine which view of science is the right one. Legislatures "are better qualified to weigh and 'evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.'" *McCleskey* v. *Kemp*, 481 U. S. 279, 319 (1987) (quoting *Gregg, supra*, at 186).

Even putting aside questions of methodology, the studies cited by the Court offer scant support for a categorical prohibition of the death penalty for murderers under 18. At most, these studies conclude that, *on average*, or *in most cases*, persons under 18 are unable to take moral responsibility for their actions. Not one of the cited studies opines that all individuals under 18 are unable to appreciate the nature of their crimes.

Moreover, the cited studies describe only adolescents who engage in risky or antisocial behavior, as many young people do. Murder, however, is more than just risky or antisocial behavior. It is entirely consistent to believe that young people often act impetuously and lack judgment, but, at the same time, to believe that those who commit premeditated murder are—at least sometimes—just as culpable as adults. Christopher Simmons, who was only seven months shy of his 18th birthday when he murdered Shirley Crook, described to his friends *beforehand*—"[i]n chilling, callous terms," as the Court puts it, *ante*, at 556—the murder he planned to commit. He then broke into the home of an innocent woman, bound her with duct tape and electrical wire, and threw her off a bridge alive and conscious. *Ante*, at 556–557. In their *amici* brief, the States of Alabama, Delaware, Oklahoma, Texas, Utah, and Virginia offer additional exam-

ples of murders committed by individuals under 18 that involve truly monstrous acts. In Alabama, two 17-year-olds, one 16-year-old, and one 19-year-old picked up a female hitchhiker, threw bottles at her, and kicked and stomped her for approximately 30 minutes until she died. They then sexually assaulted her lifeless body and, when they were finished, threw her body off a cliff. They later returned to the crime scene to mutilate her corpse. See Brief for Alabama et al. as *Amici Curiae* 9–10; see also *Loggins* v. *State*, 771 So. 2d 1070, 1074–1075 (Ala. Crim. App. 1999); *Duncan* v. *State*, 827 So. 2d 838, 840–841 (Ala. Crim. App. 1999). Other examples in the brief are equally shocking. Though these cases are assuredly the exception rather than the rule, the studies the Court cites in no way justify a constitutional imperative that prevents legislatures and juries from treating exceptional cases in an exceptional way—by determining that some murders are not just the acts of happy-go-lucky teenagers, but heinous crimes deserving of death.

That "almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent," *ante*, at 569, is patently irrelevant—and is yet another resurrection of an argument that this Court gave a decent burial in *Stanford.* (What kind of Equal Justice under Law is it that—without so much as a "Sorry about that"—gives as the basis for sparing one person from execution arguments *explicitly rejected* in refusing to spare another?) As we explained in *Stanford*, 492 U. S., at 374, it is "absurd to think that one must be mature enough to drive carefully, to drink responsibly, or to vote intelligently, in order to be mature enough to understand that murdering another human being is profoundly wrong, and to conform one's conduct to that most minimal of all civilized standards." Serving on a jury or entering into marriage also involve decisions far more sophisticated than the simple decision not to take another's life.

Moreover, the age statutes the Court lists "set the appropriate ages for the operation of a system that makes its determinations in gross, and that does not conduct individualized maturity tests." *Ibid.* The criminal justice system, by contrast, provides for individualized consideration of each defendant. In capital cases, this Court requires the sentencer to make an individualized determination, which includes weighing aggravating factors and mitigating factors, such as youth. See *Eddings,* 455 U. S., at 115–117. In other contexts where individualized consideration is provided, we have recognized that at least some minors will be mature enough to make difficult decisions that involve moral considerations. For instance, we have struck down abortion statutes that do not allow minors deemed mature by courts to bypass parental notification provisions. See, *e. g., Bellotti* v. *Baird,* 443 U. S. 622, 643–644 (1979) (opinion of Powell, J.); *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 74–75 (1976). It is hard to see why this context should be any different. Whether to obtain an abortion is surely a much more complex decision for a young person than whether to kill an innocent person in cold blood.

The Court concludes, however, *ante,* at 572–573, that juries cannot be trusted with the delicate task of weighing a defendant's youth along with the other mitigating and aggravating factors of his crime. This startling conclusion undermines the very foundations of our capital sentencing system, which entrusts juries with "mak[ing] the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system.'" *McCleskey, supra,* at 311 (quoting H. Kalven & H. Zeisel, The American Jury 498 (1966)). The Court says, *ante,* at 573, that juries will be unable to appreciate the significance of a defendant's youth when faced with details of a brutal crime. This assertion is based on no evidence; to the contrary, the Court itself acknowledges that the execution of under-18 offenders is "infrequent" even in the States "with-

out a formal prohibition on executing juveniles," *ante,* at 564, suggesting that juries take seriously their responsibility to weigh youth as a mitigating factor.

Nor does the Court suggest a stopping point for its reasoning. If juries cannot make appropriate determinations in cases involving murderers under 18, in what other kinds of cases will the Court find jurors deficient? We have already held that no jury may consider whether a mentally deficient defendant can receive the death penalty, irrespective of his crime. See *Atkins,* 536 U. S., at 321. Why not take other mitigating factors, such as considerations of childhood abuse or poverty, away from juries as well? Surely jurors "overpower[ed]" by "the brutality or cold-blooded nature" of a crime, *ante,* at 573, could not adequately weigh these mitigating factors either.

The Court's contention that the goals of retribution and deterrence are not served by executing murderers under 18 is also transparently false. The argument that "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished," *ante,* at 571, is simply an extension of the earlier, false generalization that youth *always* defeats culpability. The Court claims that "juveniles will be less susceptible to deterrence," *ibid.,* because " '[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent,'" *ante,* at 572 (quoting *Thompson,* 487 U. S., at 837). The Court unsurprisingly finds no support for this astounding proposition, save its own case law. The facts of this very case show the proposition to be false. Before committing the crime, Simmons encouraged his friends to join him by assuring them that they could "get away with it" because they were minors. *State ex rel. Simmons* v. *Roper,* 112 S. W. 3d 397, 419 (Mo. 2003) (Price, J., dissenting). This fact may have influenced the jury's decision to impose capital punishment despite Simmons' age.

Because the Court refuses to entertain the possibility that its own unsubstantiated generalization about juveniles could be wrong, it ignores this evidence entirely.

## III

Though the views of our own citizens are essentially irrelevant to the Court's decision today, the views of other countries and the so-called international community take center stage.

The Court begins by noting that "Article 37 of the United Nations Convention on the Rights of the Child, [1577 U. N. T. S. 3, 28 I. L. M. 1448, 1468–1470, entered into force Sept. 2, 1990,] which every country in the world has ratified *save for the United States* and Somalia, contains an express prohibition on capital punishment for crimes committed by juveniles under 18." *Ante*, at 576 (emphasis added). The Court also discusses the International Covenant on Civil and Political Rights (ICCPR), December 19, 1966, 999 U. N. T. S. 175, *ante*, at 567, 576, which the Senate ratified only subject to a reservation that reads:

> "The United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age." Senate Committee on Foreign Relations, International Covenant on Civil and Political Rights, S. Exec. Rep. No. 102–23, p. 11 (1992).

Unless the Court has added to its arsenal the power to join and ratify treaties on behalf of the United States, I cannot see how this evidence favors, rather than refutes, its position. That the Senate and the President—those actors our Constitution empowers to enter into treaties, see Art. II, § 2—have declined to join and ratify treaties prohibiting

execution of under-18 offenders can only suggest that *our country* has either not reached a national consensus on the question, or has reached a consensus contrary to what the Court announces. That the reservation to the ICCPR was made in 1992 does not suggest otherwise, since the reservation still remains in place today. It is also worth noting that, in addition to barring the execution of under-18 offenders, the United Nations Convention on the Rights of the Child prohibits punishing them with life in prison without the possibility of release. If we are truly going to get in line with the international community, then the Court's reassurance that the death penalty is really not needed, since "the punishment of life imprisonment without the possibility of parole is itself a severe sanction," *ante*, at 572, gives little comfort.

It is interesting that whereas the Court is not content to accept what the States of our Federal Union *say*, but insists on inquiring into what they *do* (specifically, whether they in fact *apply* the juvenile death penalty that their laws allow), the Court is quite willing to believe that every foreign nation—of whatever tyrannical political makeup and with however subservient or incompetent a court system—in fact *adheres* to a rule of no death penalty for offenders under 18. Nor does the Court inquire into how many of the countries that have the death penalty, but have forsworn (on paper at least) imposing that penalty on offenders under 18, have what no State of this country can constitutionally have: a *mandatory* death penalty for certain crimes, with no possibility of mitigation by the sentencing authority, for youth or any other reason. I suspect it is most of them. See, *e. g.*, R. Simon & D. Blaskovich, A Comparative Analysis of Capital Punishment: Statutes, Policies, Frequencies, and Public Attitudes the World Over 25, 26, 29 (2002). To forbid the death penalty for juveniles under such a system may be a good idea, but it says nothing about our system, in which the sentencing authority, typically a jury, always can, and almost

always does, withhold the death penalty from an under-18 offender except, after considering all the circumstances, in the rare cases where it is warranted. The foreign authorities, in other words, do not even speak to the issue before us here.

More fundamentally, however, the basic premise of the Court's argument—that American law should conform to the laws of the rest of the world—ought to be rejected out of hand. In fact the Court itself does not believe it. In many significant respects the laws of most other countries differ from our law—including not only such explicit provisions of our Constitution as the right to jury trial and grand jury indictment, but even many interpretations of the Constitution prescribed by this Court itself. The Court-pronounced exclusionary rule, for example, is distinctively American. When we adopted that rule in *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961), it was "unique to American jurisprudence." *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 415 (1971) (Burger, C. J., dissenting). Since then a categorical exclusionary rule has been "universally rejected" by other countries, including those with rules prohibiting illegal searches and police misconduct, despite the fact that none of these countries "appears to have any alternative form of discipline for police that is effective in preventing search violations." Bradley, *Mapp* Goes Abroad, 52 Case W. Res. L. Rev. 375, 399–400 (2001). England, for example, rarely excludes evidence found during an illegal search or seizure and has only recently begun excluding evidence from illegally obtained confessions. See C. Slobogin, Criminal Procedure: Regulation of Police Investigation 550 (3d ed. 2002). Canada rarely excludes evidence and will only do so if admission will "bring the administration of justice into disrepute." *Id.*, at 550–551 (internal quotation marks omitted). The European Court of Human Rights has held that introduction of illegally seized evidence does not violate the "fair trial" requirement in Article 6, § 1, of the European Convention on

Human Rights. See Slobogin, *supra,* at 551; Bradley, *supra,* at 377–378.

The Court has been oblivious to the views of other countries when deciding how to interpret our Constitution's requirement that "Congress shall make no law respecting an establishment of religion . . . ." Amdt. 1. Most other countries—including those committed to religious neutrality—do not insist on the degree of separation between church and state that this Court requires. For example, whereas "we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions," *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 842 (1995) (citing cases), countries such as the Netherlands, Germany, and Australia allow direct government funding of religious schools on the ground that "the state can only be truly neutral between secular and religious perspectives if it does not dominate the provision of so key a service as education, and makes it possible for people to exercise their right of religious expression within the context of public funding." S. Monsma & J. Soper, The Challenge of Pluralism: Church and State in Five Democracies 207 (1997); see also *id.,* at 67, 103, 176. England permits the teaching of religion in state schools. *Id.,* at 142. Even in France, which is considered "America's only rival in strictness of church-state separation," "[t]he practice of contracting for educational services provided by Catholic schools is very widespread." C. Glenn, The Ambiguous Embrace: Government and Faith-Based Schools and Social Agencies 110 (2000).

And let us not forget the Court's abortion jurisprudence, which makes us one of only six countries that allow abortion on demand until the point of viability. See Larsen, Importing Constitutional Norms from a "Wider Civilization": *Lawrence* and the Rehnquist Court's Use of Foreign and International Law in Domestic Constitutional Interpretation, 65 Ohio St. L. J. 1283, 1320 (2004); Center for Reproduc-

tive Rights, The World's Abortion Laws (June 2004), http://
www.reproductiverights.org/pub_fac_abortion_laws.html.
Though the Government and *amici* in cases following *Roe*
v. *Wade,* 410 U. S. 113 (1973), urged the Court to follow
the international community's lead, these arguments fell
on deaf ears. See McCrudden, A Part of the Main? The
Physician-Assisted Suicide Cases and Comparative Law
Methodology in the United States Supreme Court, in Law at
the End of Life: The Supreme Court and Assisted Suicide
125, 129–130 (C. Schneider ed. 2000).

The Court's special reliance on the laws of the United
Kingdom is perhaps the most indefensible part of its opinion.
It is of course true that we share a common history with the
United Kingdom, and that we often consult English sources
when asked to discern the meaning of a constitutional text
written against the backdrop of 18th-century English law
and legal thought. If we applied that approach today, our
task would be an easy one. As we explained in *Harmelin*
v. *Michigan,* 501 U. S. 957, 973–974 (1991), the "Cruell and
Unusuall Punishments" provision of the English Declaration
of Rights was originally meant to describe those punish-
ments " 'out of [the Judges'] Power' "—that is, those punish-
ments that were not authorized by common law or statute,
but that were nonetheless administered by the Crown or the
Crown's judges. Under that reasoning, the death penalty
for under-18 offenders would easily survive this challenge.
The Court has, however—I think wrongly—long rejected a
purely originalist approach to our Eighth Amendment, and
that is certainly not the approach the Court takes today. In-
stead, the Court undertakes the majestic task of determining
(and thereby prescribing) *our* Nation's *current* standards of
decency. It is beyond comprehension why we should look,
for that purpose, to a country that has developed, in the cen-
turies since the Revolutionary War—and with increasing
speed since the United Kingdom's recent submission to the
jurisprudence of European courts dominated by continental

jurists—a legal, political, and social culture quite different from our own. If we took the Court's directive seriously, we would also consider relaxing our double jeopardy prohibition, since the British Law Commission recently published a report that would significantly extend the rights of the prosecution to appeal cases where an acquittal was the result of a judge's ruling that was legally incorrect. See Law Commission, Double Jeopardy and Prosecution Appeals, LAW COM No. 267, Cm 5048, p. 6, ¶ 1.19 (Mar. 2001); J. Spencer, The English System in European Criminal Procedures 142, 204, and n. 239 (M. Delmas-Marty & J. Spencer eds. 2002). We would also curtail our right to jury trial in criminal cases since, despite the jury system's deep roots in our shared common law, England now permits all but the most serious offenders to be tried by magistrates without a jury. See D. Feldman, England and Wales, in Criminal Procedure: A Worldwide Study 91, 114–115 (C. Bradley ed. 1999).

The Court should either profess its willingness to reconsider all these matters in light of the views of foreigners, or else it should cease putting forth foreigners' views as part of the *reasoned basis* of its decisions. To invoke alien law when it agrees with one's own thinking, and ignore it otherwise, is not reasoned decisionmaking, but sophistry.[9]

---

[9] JUSTICE O'CONNOR asserts that the Eighth Amendment has a "special character," in that it "draws its meaning directly from the maturing values of civilized society." *Ante*, at 604–605. Nothing in the text reflects such a distinctive character—and we have certainly applied the "maturing values" rationale to give brave new meaning to other provisions of the Constitution, such as the Due Process Clause and the Equal Protection Clause. See, *e. g., Lawrence* v. *Texas*, 539 U. S. 558, 571–573 (2003); *United States* v. *Virginia*, 518 U. S. 515, 532–534 (1996); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 847–850 (1992). JUSTICE O'CONNOR asserts that an international consensus can at least "serve to confirm the reasonableness of a consonant and genuine American consensus." *Ante*, at 605. Surely not unless it can also demonstrate the *un*reasonableness of such a consensus. Either America's principles are its own, or they follow the world; one cannot have it both ways. Finally, JUSTICE O'CONNOR finds it unnecessary to consult foreign law in the present case because

The Court responds that "[i]t does not lessen our fidelity to the Constitution or our pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores the centrality of those same rights within our own heritage of freedom." *Ante*, at 578. To begin with, I do not believe that approval by "other nations and peoples" should buttress our commitment to American principles any more than (what should logically follow) disapproval by "other nations and peoples" should weaken that commitment. More importantly, however, the Court's statement flatly misdescribes what is going on here. Foreign sources are cited today, *not* to underscore our "fidelity" to the Constitution, our "pride in its origins," and "our own [American] heritage." To the contrary, they are cited *to set aside* the centuries-old American practice— a practice still engaged in by a large majority of the relevant States—of letting a jury of 12 citizens decide whether, in the particular case, youth should be the basis for withholding the death penalty. What these foreign sources "affirm," rather than repudiate, is the Justices' own notion of how the world ought to be, and their diktat that it shall be so henceforth in America. The Court's parting attempt to downplay the significance of its extensive discussion of foreign law is unconvincing. "Acknowledgment" of foreign approval has no place in the legal opinion of this Court *unless it is part of the basis for the Court's judgment*—which is surely what it parades as today.

## IV

To add insult to injury, the Court affirms the Missouri Supreme Court without even admonishing that court for its

---

there is "no . . . domestic consensus" to be confirmed. *Ibid.* But since she believes that the Justices can announce their own requirements of "moral proportionality" despite the absence of consensus, why would foreign law not be relevant to *that* judgment? If foreign law is powerful enough to supplant the judgment of the American people, surely it is powerful enough to change a personal assessment of moral proportionality.

flagrant disregard of our precedent in *Stanford*. Until today, we have always held that "it is this Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U. S. 3, 20 (1997). That has been true even where "'changes in judicial doctrine' ha[ve] significantly undermined" our prior holding, *United States* v. *Hatter*, 532 U. S. 557, 567 (2001) (quoting *Hatter* v. *United States*, 64 F. 3d 647, 650 (CA Fed. 1995)), and even where our prior holding "appears to rest on reasons rejected in some other line of decisions," *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989). Today, however, the Court silently approves a state-court decision that blatantly rejected controlling precedent.

One must admit that the Missouri Supreme Court's action, and this Court's indulgent reaction, are, in a way, understandable. In a system based upon constitutional and statutory text democratically adopted, the concept of "law" ordinarily signifies that particular words have a fixed meaning. Such law does not change, and this Court's pronouncement of it therefore remains authoritative until (confessing our prior error) we overrule. The Court has purported to make of the Eighth Amendment, however, a mirror of the passing and changing sentiment of American society regarding penology. The lower courts can look into that mirror as well as we can; and what we saw 15 years ago bears no necessary relationship to what they see today. Since they are not looking at the same text, but at a different scene, why should our earlier decision control their judgment?

However sound philosophically, this is no way to run a legal system. We must disregard the new reality that, to the extent our Eighth Amendment decisions constitute something more than a show of hands on the current Justices' current personal views about penology, they purport to be nothing more than a snapshot of American public opinion at a particular point in time (with the timeframes now shortened to a mere 15 years). We must treat these deci-

sions just as though they represented *real* law, real prescriptions democratically adopted by the American people, as conclusively (rather than sequentially) construed by this Court. Allowing lower courts to reinterpret the Eighth Amendment whenever they decide enough time has passed for a new snapshot leaves this Court's decisions without any force— especially since the "evolution" of our Eighth Amendment is no longer determined by objective criteria. To allow lower courts to behave as we do, "updating" the Eighth Amendment as needed, destroys stability and makes our case law an unreliable basis for the designing of laws by citizens and their representatives, and for action by public officials. The result will be to crown arbitrariness with chaos.